610 So.2d 1299 (1992)
Joseph T. GRISSOM, Jr., Appellant,
v.
COMMERCIAL UNION INSURANCE COMPANY, a corporation, Appellee.
No. 91-1031.
District Court of Appeal of Florida, First District.
December 22, 1992.
Rehearing Denied February 1, 1993.
*1301 Stephen P. Smith III of Smith & Smith, P.A., Jacksonville, for appellant.
Bruce S. Bullock and Bert A. Rasmussen of Bullock, Childs & Pendley, P.A., for appellee.
ZEHMER, Judge.
Joseph T. Grissom, Jr., appeals an adverse final judgment in his suit to recover litigation expenses incurred in defending a claim for damages allegedly within the coverage of Grissom's liability insurance policy with Commercial Union Insurance Company based on its refusal to defend. The trial court denied Grissom relief on two grounds. First, the court ruled that the complaint in the original suit against Grissom did not allege facts constituting an insured "occurrence" or "accident" within policy coverage, so Commercial Union had no duty to defend. Second, the court ruled that this action was barred by the applicable statute of limitations because it was not timely brought within five years of the date Commercial Union declined coverage. Concluding that both of these rulings are erroneous, we reverse and remand for further proceedings.

I.
This action was commenced on August 11, 1989, when Grissom filed a complaint against Commercial Union for breach of contract. Commercial Union had issued Grissom an owner's, landlord's, and tenant's liability insurance policy insuring him against liability for bodily injury or property damage "caused by an occurrence and arising out of the ownership, maintenance or use of the insured premises." Under the policy, Commercial Union agreed to defend Grissom in any lawsuit based on a covered liability claim. The case ultimately went to trial on the issues raised in the complaint, the amended answer and affirmative defenses, and the reply to the affirmative defenses. The evidence was largely undisputed.
In 1975, Grissom was sued in circuit court, case number 75-9302-CA, by Ayers and Thompson, as trustees of the Seaboard Avenue Baptist Church located across the street from Grissom's property. The complaint, as amended, alleged that Grissom had intentionally filled and elevated a natural watercourse across his land, with knowledge that the drainage of a natural stream was being blocked, and that by reason of filling and raising the elevation of his land, and "by reason of failing to provide for adequate drainage facilities," waters backed up and flooded the church's property. The church sought monetary damages and a permanent injunction requiring Grissom to restore and maintain the previously existing watercourse drainage.[1]
*1302 Commercial Union initially assumed the defense of this claim under a reservation of rights, but subsequently declined coverage and withdrew its defense, asserting in its letter of September 12, 1975, that the actions for which Grissom was sued "are alleged to be intentional" and "[t]he alleged consequences appear to have been forseeable [sic], in general nature if not in specific extent."[2]
Grissom assumed the defense of the action and filed third-party complaints alleging claims arising out of the drainage problem that was the basis of the church's suit against him. The third-party defendants were upstream owners and the City of Jacksonville, and Grissom alleged that these third-party defendants had altered the natural drainage system so as to cause the drainage problems suffered by the church and Grissom himself. These third-party defendants counterclaimed for damages and injunctive relief against Grissom based on his having altered the flow of water across his land. Although the counterclaim in evidence alleges that Grissom filled in his land, it does not allege that he intended to harm the property of the other owners or the City. By letter of October 6, 1976, Grissom notified Commercial Union of these counterclaims and requested that it reconsider its decision declining coverage under the circumstances. Commercial Union did not provide a defense in response to this request.
The original claim for property damage by the church was settled pursuant to an agreement executed on September 25, 1976. However, the injunction claim was tried and the temporary injunction against Grissom was made permanent in an amended final judgment entered March 22, 1979. Grissom continued to prosecute the surviving third-party claims and counterclaims in that case until all claims were voluntarily dismissed on December 19, 1984.
Certain third-party defendants were dismissed from the original suit, case number 75-9302-CA, in 1976 and Grissom immediately filed another suit against them in circuit court, case number 76-12676-CA. The claims asserted in this second suit were essentially the same as the third-party claims in case number 75-9302-CA, in that Grissom sought monetary damages and injunctive relief in respect to changes made by the defendants to upland drainage that allegedly caused damage to Grissom's real property and the church's property. Similar counterclaims were asserted against Grissom by the defendants in that case. All claims in the second suit were litigated between Grissom and the defendants until the action was dismissed pursuant to a stipulation executed on October 4, 1988.
The evidence also established that Grissom had purchased the real property involved *1303 in 1962. The property lay adjacent to Seaboard Avenue, and a drainage ditch or swale ran down Grissom's property from a culvert that ran underneath Seaboard Avenue from the other (east) side and drained a large area. The swale meandered across Grissom's land, across adjoining property to the north of Grissom's land, and thence into a creek. In 1964, Superior Homes, Inc., owner of a large tract on the east side of Seaboard Avenue, improved drainage of its property by construction of a canal 1000 feet long, 20 feet wide, and 5 feet deep, extending eastward from the culvert underneath Seaboard Avenue. This canal was connected to a drainage system that drained some 40 acres of land. The canal increased the velocity and volume of water emptying onto Grissom's land, causing substantial erosion to his land. Grissom re-routed the swale, after consulting with the Soil Conservation Service of the United States Department of Agriculture, in an attempt to minimize this increased erosion. In 1975, extremely heavy rains fell on this neighborhood  up to 50 percent higher than normal during some months. As a consequence, the church experienced flooding of its property, and it sued Grissom on August 15, 1975, alleging the claims set forth in note 1, supra.
Underlying the settlement of all claims arising out of this drainage dispute in both lawsuits was the installation of an underground culvert by the City of Jacksonville to adequately drain the area in question. This culvert was installed immediately north of Grissom's property line at a cost of more than $200,000. This installation allowed the development planned on the east side of Seaboard Avenue to proceed without flooding the area and without causing the erosion that had been occurring on the west side of the street, primarily on Grissom's property.
In this suit against Commercial Union, Grissom sought to recover damages for expenses and attorneys' fees incurred in defending the drainage litigation initiated by the church and the defense of the various counterclaims against Grissom spawned thereby. The trial court entered final judgment for Commercial Union on two grounds.
First, the trial court found that the policy definition of an "occurrence" was clear and unambiguous. It ruled that the insurance company's duty to defend must be determined from the allegations of the complaint alone, and if the complaint affirmatively shows either the non-existence of coverage or applicability of a policy exclusion, the insurer has no obligation to defend. Reviewing the allegations of the complaint, the judgment concluded that "the alleged intentional acts of the Plaintiff Grissom in blocking the alleged waterway, and in the continued willful blockage into the year of coverage, while the complaining church's lands and buildings were allegedly flooded and damaged, was neither an `occurrence' nor an `accident' as defined by the policy."
Second, the court ruled that the five-year statute of limitations applicable to Grissom's claim for breach of contract commenced running in 1975 when Commercial Union notified Grissom that it declined to defend the suit, or alternatively, when Grissom settled the damage claim with the church in 1976, and thus the limitations period had expired long before the present action against Commercial Union was filed in August 1989. The court further found no basis in the evidence for waiver or estoppel by reason of Commercial Union's representations or conduct that would avoid application of the statute of limitations defense.
Grissom challenges both rulings on this appeal.

II.
Addressing Grissom's first point, we hold that the court erred in ruling that the alleged claims were not within the policy coverage. We have no disagreement with the principles of law recited in the final judgment, but conclude that these principles were incorrectly applied due to a misinterpretation of both the legal effect of the policy definitions and the implication of the allegations in the amended complaint.

*1304 A.
The explicit reason stated in Commercial Union's letter declining coverage and defense of the church's lawsuit was that the complaint did not allege an "occurrence" or "accident" within the meaning of the policy because it alleged that Grissom's actions were intentional. (See note 2, supra.) Agreeing with Commercial Union's contentions, the trial court focused entirely on Grissom's intentional filling of the drainage watercourse, concluding therefrom that no "occurrence" or "accident" within the policy coverage had been alleged. Thus, we must first determine the meaning of an "occurrence" or "accident" within the meaning of the policy.
The explicit terms of the Commercial Union policy insured Grissom for "all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury or ... property damage to which this insurance applies caused by an occurrence and arising out of the ownership, maintenance or use of the insured premises... ."[3] (Emphasis added.) The policy further provided that Commercial Union "shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent... ." (Emphasis added.) The term "occurrence" was explicitly defined in the policy to mean "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured... ."
We first note that the trial court erred in ruling that the policy definition of "occurrence" is clear and unambiguous. The case law of this state has given diverse meanings to the word "accident" when used in insurance policies, and this fact is sufficient in itself to belie the notion that the policy language is clear and unambiguous. Accordingly, in determining the meaning of these policy provisions, we apply the settled rule that insurance policies are to be construed liberally in favor of the insured and strictly against the insurer, and that whenever the language is susceptible of two or more constructions, the court must adopt that which is most favorable to the insured. E.g., Roberson v. United Services Automobile Ass'n, 330 So.2d 745, 746 (Fla. 1st DCA), cert. denied, 342 So.2d 1104 (Fla. 1976).
As used in various types of insurance policies, the term "accident," when not otherwise explicitly defined or clarified by language in the policy itself, has been given varying meanings, with no indication of uniform agreement on a single accepted definition. Thus, in Hardware Mut. Cas. Co. v. Gerrits, 65 So.2d 69 (Fla. 1953), the supreme court, without citing a single precedent, concluded on the facts of that case that:
An effect which is the natural and probable consequence of an act or course of action is not an accident. The effect which was the natural and probable consequence of the Plaintiff's act in erecting the building was the encroachment on the adjoining property. This is true whether the Plaintiff knew the facts as they were or understood them to be other than they were. The result or effect would be the same.
65 So.2d at 70-71. In Bennett v. Fidelity & Cas. Co. of N.Y., 132 So.2d 788 (Fla. 1st DCA 1961), this court recognized the difficulty encountered by the courts in defining "accident" in discussing and applying the concept of accident set forth in the Gerrits opinion. Other Florida decisions have defined "accident" to include an unexpected result of a known cause as distinguished from an unexpected cause of an expected injury, applying the so-called "man-on-the-street" definition. E.g., Beneficial Standard Life Ins. Co. v. Forsyth, 447 So.2d 459 (Fla. 2d DCA 1984); Braley v. American Home Assur. Co., 354 So.2d 904 (Fla. 2d DCA), cert. denied, 359 So.2d 1210 (Fla. 1978). In Roberson v. United Services Automobile Ass'n, 330 So.2d 745 (Fla. 1st *1305 DCA 1975), this court defined the term "accident" as meaning variously "an unexpected or unusual event; it is something which happens by chance and without design; it is an event from an unknown cause... . An average person buying a personal accident policy assumes that he is covered for any fortuitous and undesigned injury." 330 So.2d at 746.
The meaning of "accident" as that term is used in insurance policies was particularly well described by Judge Hubbart in Hartford Fire Ins. Co. v. Spreen, 343 So.2d 649 (Fla. 3d DCA 1977), wherein he explained:
The Florida courts in a line of cases have consistently held that insurance policies covering liability for an "accident" apply to any bodily injury or property damage inflicted by the insured on a third party where the insured does not intend to cause any harm to the third party; this result obtains even though damages are caused by the insured's intentional acts and were reasonably foreseeable by the insured. Insurance coverage has accordingly been found under such policies where an insured unintentionally shoots himself while playing "Russian Roulette," Gulf Life Insurance Co. v. Nash, 97 So.2d 4 (Fla. 1957); or unintentionally shoots himself while attempting to disarm a person in a fight in which the insured is the aggressor, Harvey v. St. Paul Western Insurance Cos., 166 So.2d 822 (Fla. 3d D.C.A. 1964); or unintentionally shoots a bystander during a family quarrel, Grange Mutual Casualty Co. v. Thomas, 301 So.2d 158 (Fla. 2d D.C.A. 1974); or unintentionally hits a person in a crowd of people with a car while slowly driving into the edge of the crowd intending to disperse them, Phoenix Ins. Co. v. Helton, 298 So.2d 177 (Fla. 1st D.C.A. 1974), or unintentionally injures a person in a car while unintentionally pushing the car which was blocking a driveway, Cloud v. Shelby Mutual Insurance Co., 248 So.2d 217 (Fla. 3d D.C.A. 1971). Running through all of these cases is an act of negligence by the insured, sometimes gross or even culpable negligence. But never has coverage been found under such policies where the insured's act was deliberately designed to cause harm to the injured party.
Indeed the law is well-settled that there can be no coverage under an insurance policy which insures against an "accident" where "the [insured's] wrongful act complained of is intentionally directed specifically toward the person injured by such act. .. ." Grange Mutual Casualty Co. v. Thomas, 301 So.2d 158, 159 (Fla. 2d D.C.A. 1974). "Early on it became the overwhelming consensus in those cases that since such a policy was in essence an indemnification contract public policy mandated that an intentional tort was not an `accident' within the coverage for the reason that one ought not to be permitted to indemnify himself against his intentional [torts]." Latherby Insurance Co. v. Willoughby, 315 So.2d 553 (Fla. 2d D.C.A. 1975).
343 So.2d at 650-51. Holding that the assault and battery in that case was an intentional tort and not an accident under the policy, the court rejected the argument that the insured did not intend to cause the serious injury that actually resulted from the intentional battery, since the determination of coverage does not turn on the extent of injury the insured intended to inflict but whether the insured intended to cause any injury at all.
Similarly, in Spengler v. State Farm Fire & Cas. Co., 568 So.2d 1293 (Fla. 1st DCA 1990), rev. denied, 577 So.2d 1328 (Fla. 1991), where the insured intended to shoot a supposed burglar but actually shot his girlfriend instead, we held that the exception in the insured's liability policy excluding coverage for bodily injury or property damage "which is either expected or intended by an insured" did not apply, explaining that:
[T]he policy exception at issue and exceptions similarly worded mean that liability is not precluded for an expected or intended "act" but rather for an expected or intended "injury" and that when the act is intentional, but the injury is not, the exclusionary clause is not applicable.
*1306 Id. at 1295. We also cited to similar insurance policy provisions in Grange Mut. Cas. Co. v. Thomas, 301 So.2d 158 (Fla. 2d DCA 1974), wherein the insured shot Thomas, who was a nonparticipant in a family quarrel in which the insured was involved, and it was shown that the bullet was not intended to hit Thomas (although it may have been intended for someone else). Discussing the ruling in that case, we stated:
The second district ruled that the provision of the insured's policy that excluded coverage for bodily injury that is expected or intended by the insured did not apply to that situation. In so holding, the court stated:
... unless the wrongful act complained of is intentionally directed specifically toward the person injured by such act, the injury, as to that victim, is an accident or "occurrence" for which an insured tortfeasor may become legally answerable in damages as contemplated by the coverage provision of his homeowners liability policy.
301 So.2d at 159 (emphasis added).
568 So.2d at 1295.
In the Commercial Union policy, the word "accident" in the definition of "occurrence" is not explicitly defined, but it is used in a sentence that contains additional exemplifying or qualifying language. Therefore, in arriving at the meaning and intent of this definition of "occurrence," we construe the word "accident" to include an unexpected or unintended cause of an injury or damage as well as an unexpected or unintended injury or damage that results from a known cause. This meaning, however, is further exemplified by the remaining language in that sentence.
Thus, the parenthetical phrase, "continuous or repeated exposure to conditions," immediately follows the word "accident" and connotes a concept of "accident" that includes not only a single, sudden, unexpected event that causes damage, but also includes injury or damage that results from a created or pre-existing condition for which the insured is legally responsible, even though it may have occurred or persisted over an extended period of time. The definition of "occurrence" is further clarified by the clause, "results in bodily injury or property damage neither expected nor intended from the standpoint of the insured... ." This clause connotes that coverage exists for any accident where the acts or condition for which the insured is legally responsible results in bodily injury or property damage. This clause further connotes that coverage exists if the resulting damage is unintentional in the sense that it is "neither expected nor intended from the standpoint of the insured." The phrase "from the standpoint of the insured" means that whether the result was expected or intended by the insured is a critical element. In short, the definition in this sentence is simply a use of negative language to express a positive intent to exclude from coverage any occurrence where the resulting bodily injury or property damage was intentional, i.e., either expected or intended by the insured.[4]

B.
Next, we review the allegations of the church's amended complaint (see note 1, supra) to determine whether the facts alleged constitute an "occurrence" within the meaning of the policy. Resolution of this issue is governed in part by the following general principles concerning an insurer's duty to defend a claim.
An insurer's duty to defend is to be determined from the allegations in the complaint against the insured. National Union Fire Ins. Co. v. Lenox Liquors, *1307 Inc., 358 So.2d 533 (Fla. 1977); State Farm Fire and Cas. Co. v. Edgecumbe, 471 So.2d 209 (Fla. 1st DCA 1985); Baron Oil Co. v. Nationwide Mut. Fire Ins. Co., 470 So.2d 810 (Fla. 1st DCA 1985). The insurer must defend if the allegations in the complaint could bring the insured within the policy provisions of coverage. State Farm Mutual Auto. Ins. Co. v. Universal Atlas Cement Co., 406 So.2d 1184 (Fla. 1st DCA 1981), rev. denied, 413 So.2d 877 (Fla. 1982). If the complaint alleges facts partially within and partially outside the coverage of the policy, the insurer is obligated to defend the entire suit. Tropical Park, Inc. v. United States Fidelity and Guaranty Co., 357 So.2d 253, 256 (Fla. 3d DCA 1978). The duty to defend is separate and apart from the duty to indemnify and the insurer is required to defend the suit even if the true facts later show there is no coverage. Klaesen Bros., Inc. v. Harbor Ins. Co., 410 So.2d 611 (Fla. 4th DCA 1982). All doubts as to whether a duty to defend exists in a particular case must be resolved against the insurer and in favor of the insured. Baron Oil Co., 470 So.2d at 814. So long as the complaint alleges facts that create potential coverage under the policy, the insurer must defend the suit. Tropical Park, 357 So.2d at 256. If it later becomes apparent (such as in an amended complaint) that claims not originally within the scope of the pleadings are being made, which are now within coverage, the insurer upon notification would become obligated to defend. Broward Marine, Inc. v. Aetna Ins. Co., 459 So.2d 330 (Fla. 4th DCA 1984).
The church's amended complaint alleged that Grissom intentionally filled in the watercourse across his land and thereby raised its elevation so as to block the flow of water from its original course, with full knowledge that the drainage was being blocked. It further alleged, however, that by reason of this act, "and by reason of failing to provide for adequate drainage facilities ... [Grissom] caused the waters to back up and to flood the plaintiffs' property." There are no allegations that Grissom filled the watercourse and elevated his land with the intention to flood the church's property or otherwise intentionally damage church property; nor is it alleged that Grissom knew or intended that filling in the watercourse would necessarily cause the church property across the street to flood and be damaged in some rainstorms. The language of the complaint, "at least marginally and by reasonable implication," Klaesen Bros., 410 So.2d at 613, could be construed to mean that Grissom intentionally filled in the watercourse to avoid damage to his own property, but negligently failed to provide adequate alternative drainage and thereby created a condition that resulted in unintentional damage by flooding of the church property across the street during a heavy rainfall.[5] Clearly, the intentional filling of the watercourse was not an "accident" under the policy; but the unintentional flooding and damage to church property resulting from the negligent failure to provide adequate drainage facilities, being neither expected nor intended, does constitute an accident within the case law definitions previously discussed. These allegations of unintended damage were legally sufficient to state a claim against Grissom for property damage caused by the flooding, and to obtain recovery the church would not have to prove that Grissom either intended or expected the resulting property damage.
We are mindful that the amended complaint further alleged a "continuing wrong" in that Grissom "has totally failed to voluntarily correct his wrong and to clear the watercourse as requested." However, this allegation was made to support the claim for injunctive relief to correct a continuing nuisance, and it does not vitiate a reasonable interpretation of the complaint as alleging a claim for unintended *1308 or unexpected damages due to flooding. The complaint does not allege that the property damage was attributable to intentional or expected flooding on more than one occasion.
For these reasons, the trial court erred in ruling that "the alleged intentional acts of the Plaintiff Grissom in blocking the alleged waterway, and in the continued willful blockage into the year of coverage, while the complaining church's lands and buildings were allegedly flooded and damaged, was neither an `occurrence' nor an `accident' as defined in the policy." The error lies in limiting consideration to the intentional filling of the waterway rather than determining whether the resulting damage to the church's property was "neither expected nor intended" by the insured.

C.
The cases cited to us by Commercial Union and relied on in the final judgment are materially and factually distinguishable from this case.
In Hardware Mut. Cas. Co. v. Gerrits, 65 So.2d 69, the insured intentionally located his building on a particular piece of property belonging to a neighbor, and the fact that the insured was mistaken about the exact location of the property line showed only a mistake of fact; this mistake did not amount to an accident because the intentional placement of the building appropriated that particular spot of land to the insured's use and was clearly the natural and probable consequence of the alleged intentional act as a matter of law. In this case, it cannot be said as a matter of law that Grissom's filling of the swale would necessarily and intentionally flood the church property.
In Bennett v. Fidelity & Cas. Co. of N.Y., 132 So.2d 788 (Fla. 1st DCA 1961), the insured built a dam that caused flooding of adjacent property and immediately removed the dam when it became apparent that the adjacent landowner's property had been flooded. However, the insured thereafter reconstructed the dam and did not remove it when another rain occurred and flooded the adjacent land. The insured's subsequent conduct of rebuilding the dam and not removing the dam manifested an intent to cause the flooding, and this court held that these "allegations effectively eliminate the idea of the `unexpected,' which we think is an important element in a legal definition of the term `accident.'" Id. at 792. No such intentional injury was alleged against Grissom.
In West Building Materials, Inc. v. Allstate Ins. Co., 363 So.2d 398 (Fla. 1st DCA 1978), this court held that the insured's act of intentionally setting off a smoke bomb in a building and causing it to burn was within the policy exclusion of coverage for damage that is expected or intended by the insured. The court rejected the insured's contention that the fire was an accident because the insured intended to cause only smoke, not fire. The setting of the bomb was an intentional act committed for the purpose of causing damage to the building, and the fact that the bomb started the fire as well as caused smoke damage went only to the extent of the expected injury to the building. The rationale of this decision is similar to that in Hartford Fire Ins. Co. v. Spreen, 343 So.2d 649, in which the court likewise rejected the notion that an injury from assault and battery was not an accident because the insured intended to injure the victim, and a dispute over the extent of the intended injury did not overcome the intentional character of the injury.
In State Farm Fire and Cas. Co. v. Edgecumbe, 471 So.2d 209 (Fla. 1st DCA 1985), the complaint for malicious prosecution explicitly alleged that the insured made the false accusations, "intending to injure" the plaintiff. We held that State Farm did not owe the insured a defense of that action because this allegation of injury brought "the claim within the exclusion of the State Farm policy providing no coverage for claims or suits brought against the insured for bodily injury or property damage which is expected or intended by the insured." Id. at 210.
These cases are materially distinguishable from the instant case because the complaint against Grissom did not allege facts *1309 showing, directly or by necessary implication, that Grissom expected or intended to cause any injury by flooding the church's property or any counterclaiming third-party defendant's property.
We hold, therefore, that the claims alleged in the church's complaint, and the third-party counterclaims asserted against Grissom in connection with this water drainage dispute arising out of the church's complaint, involved potential claims for damages that were apparently within the policy coverage. Thus, Commercial Union wrongfully breached its duty under the policy when it declined to defend these claims against Grissom.

III.
We now address Grissom's second point, that the trial court erred in ruling that his cause of action against Commercial Union was barred by the statute of limitations. There is no dispute that this action for breach of Commercial Union's duty to defend is governed by the five-year statute of limitations for breach of contract. § 95.11(2)(b), Fla. Stat. (1991). The critical issue is whether this cause of action accrued and started the statute of limitations to run more than five years before this suit was filed.[6]
The trial court ruled in the final judgment that:
12... . [T]he Plaintiff knew and considered the insurance contract to be breached by the insurer at the outset, when the insurer notified Mr. Grissom of its denial of coverage in September 1975... .
... .
14. If Condition No. 5 of the policy could be argued to put an insured in doubt as to the timing of his remedy for breach, there is no question that Mr. Grissom had removed the risk of liability for property damage contained in the suit tendered to his insurer when he entered the settlement agreement executed between himself and the Plaintiff church in 1976. His failure to commence action against Commercial Union Insurance Company within five years thereafter also bars this action.
Condition five referred to by the court is a standard "no action" provision in the policy.[7]
Clearly, the trial court treated this cause of action against Commercial Union as having accrued, thus starting the five-year limitation period to run, from the date the notice declining to defend was sent in September 1975, or, alternatively, no later than the date in September 1976 when the settlement agreement was executed between the church and Grissom. This ruling fails to accord with the applicable law for the following reasons.
It is the rule in Florida, as well as generally, that in cases for breach of an insurer's duty to defend, "the time period for measuring a statute of limitations commences at the time a litigant's liabilities or rights have been finally and fully adjudicated." Employers' Fire Ins. Co. v. Continental Ins. Co., 326 So.2d 177, 181 (Fla. 1976). Ordinarily, the statutory time commences on the date when judgment was entered and the litigation has come to an end. Continental Cas. Co. v. Florida Power & Light Co., 222 So.2d 58, 59-60 (Fla. 3d DCA), cert. denied, 229 So.2d 867 (Fla. 1969) ("We hold that Florida Power & Light's cause of action, a right to recover expenses incurred in defending a third-party action resulting from Continental's refusal to defend the third-party action in violation of its contractual duty, did not *1310 accrue until the third-party litigation ended. Terteling v. United States, 334 F.2d 250, 254-255, 167 Ct.Cl. 331 (1964). Cf. cases cited in 54 C.J.S. Limitation of Actions § 141."). E.g., Boyd Bros. Transp. Co. v. Fireman's Fund Ins. Cos., 540 F. Supp. 579 (M.D.Ala. 1982); Kielb v. Couch, 149 N.J. Super. 522, 374 A.2d 79 (1977); Bush v. Safeco Ins. Co. of America, 23 Wash. App. 327, 596 P.2d 1357 (1979). Similarly, when a policy contains a no-action clause like the one in Commercial Union's policy, that provision creates a condition precedent to the insured's right of action for the insurer's wrongful failure to defend, so that the insured's suit for recovery of the expenses for defending the claims can be initiated only after such claims have been finally determined and come to an end. Gilbert v. American Cas. Co. of Reading Pa., 219 So.2d 84 (Fla. 3d DCA), cert. denied, 225 So.2d 920 (Fla. 1969); Ginn v. State Farm Mut. Automobile Ins. Co., 417 F.2d 119 (5th Cir.1969); Kielb v. Couch, 374 A.2d 79. The rationale underlying these decisions is often expressed in terms of waiting until all claims have come to an end so that all expenses will be known and the insured can avoid splitting the cause of action, a practice looked upon with disfavor in the law.
Accordingly, when two or more related lawsuits arising out of the same occurrence are filed against the insured and the insurer wrongfully declines to defend them, the insured must await the final outcome of all such suits to sue the insurer for damages in a single action; otherwise, the insured's bringing separate actions against the insurer to make recovery of expenses incurred in defending each suit constitutes an impermissible splitting of the insured's cause of action that bars a second action against the insurer. Beck v. Pennsylvania National Mut. Cas. Ins. Co., 279 So.2d 377, 379 (Fla. 3d DCA 1973) (approving insurance company's argument that "it was incumbent on Beck [the insured] to have awaited the conclusion of the two cases, which would have established the expenses in both cases, and to have filed one action for such expenses when so determined, in order to avoid splitting the cause of action.").
Applying these principles to the facts in this case, it is readily apparent that the statute of limitations did not begin to run in 1975 when Commercial Union notified Grissom that it was declining to provide a defense. Likewise, the statute did not begin to run in 1976 when Grissom reached a settlement with the church on the damage claim, because at that time other issues remained open for adjudication in that case, and the third-party counterclaims against Grissom (which arose out of the same transaction) that Commercial Union had also declined to defend after receiving notice, also remained open for trial. Those third-party claims were not resolved with finality until they were dismissed pursuant to settlement agreements on December 19, 1984 (in case number 75-9302-CA), and on October 4, 1988 (in case number 76-12676-CA). Grissom was entitled, indeed required, to await the final resolution of all cases and claims arising out of Grissom having blocked the watercourse drainage cases before suing Commercial Union to avoid splitting his cause of action. Since the instant action against Commercial Union was filed within five years of either date of dismissal, it is not barred by the statute of limitations.[8]
The appealed judgment is reversed and this cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
SHIVERS, J., concurs.
WEBSTER, J., dissents with opinion.
WEBSTER, Judge, dissenting.
I agree with part III of the majority's opinion, which concludes that the statute of limitations is not a bar to appellant's action. I also agree, generally, with the principles of law recited in part II of the majority's opinion. However, I am unable to agree *1311 that either the church's amended complaint or any of the third party counterclaims can be read as alleging that the flooding and consequent damage constituted an "accident," as that term is used in the insurance policy and has been interpreted by the courts of this state in similar circumstances. Rather, it seems to me that all of those pleadings can only be read as alleging that the flooding and consequent damage were the natural and probable results of appellant's intentional acts. This being so, I am unable to comprehend how they can be characterized as unintended. See generally, Landis v. Allstate Ins. Co., 546 So.2d 1051 (Fla. 1989) (intent to commit harm is not required to exclude coverage under homeowners policy exclusion for bodily injury intentionally caused by the insured  all intentional acts are properly excluded); Swindal v. Prudential Property and Casualty Ins. Co., 599 So.2d 1314 (Fla. 2d DCA 1992) (homeowners policy exclusion for bodily injury expected or intended by the insured excludes coverage for injuries which are the direct and proximate result of an intentional act). For this reason, I would affirm the final judgment. Therefore, respectfully, I dissent.
NOTES
[1] The amended complaint alleged in pertinent part:

10. The plaintiffs are entitled to relief against the defendant upon the following facts:
* * * * * *
(b) At all times herein material, a certain natural watercourse was located in and passed through the defendant's land in Duval County, Florida, which said natural watercourse and said land is across the street from and in the vicinity of plaintiffs' property. Said natural watercourse served as natural drainage for the plaintiffs' property.
(c) Within the last year, defendant did knowingly and intentionally completely fill and elevate or caused to be completely filled and elevated, this natural water course. The watercourse which was filled and elevated consisted of a channel with banks, bed and running water. This watercourse was filled in for a distance of several hundred feet and was filled by the defendant with full knowledge that the drainage of a natural stream was being blocked.
(d) By reason of the filling in of the natural watercourse, by reason of raising the elevation of his land and by reason of failing to provide for adequate drainage facilities, the defendant blocked the natural flow of the stream and caused the waters to back up and to flood the plaintiffs' property. The water which has been discharged upon the lands of the plaintiffs was in such great quantity on the plaintiffs' land that it was flooded to great depths.
(e) The said acts of the defendant constitute a continuing wrong against the plaintiffs and demand has been made upon the defendant to correct his continuing wrong and to clear the natural drainage way. The defendant has totally failed to voluntarily correct his wrong and to clear the watercourse as requested. Temporary relief was obtained only after this Honorable Court granted a temporary mandatory injunction requiring the defendant to partially open the watercourse. Continuation of this nuisance would result in irreparable damage to the plaintiffs' property.
11. As a direct and proximate result of the wrongful and intentional acts of the defendant, the church building and the contents therein, parking lot, shrubbery, septic tank and grounds of the plaintiffs have been damaged along with personal property located thereon.
(Emphasis added.)
[2] The letter recited:

Coverage is declined because the policy of insurance under which the Commercial Union Insurance Company insures Mr. and Mrs. Grissom obligates the company to pay "on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage ... to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use of the insured premises ...". "Occurrence" means accident.
"Accident" is defined as "that which happens by chance or fortiutously [sic], without intention or design, and which is unexpected, unusual, and unforseen." 18 Fla.Jur., Insurance, § 687. The actions for which Mr. Grissom is being sued are alleged to be intentional. The alleged consequences appear to have been forseeable [sic], in general nature if not in specific extent.
[3] No issue is made in this case that the events here involved did not arise out of the ownership, maintenance, and use of the insured premises.
[4] Professor Keeton indicates that the "occurrence" definition in this policy is intended to function as the equivalent of an intentional injury exclusion clause:

[L]iability insurance policies have generally included clauses that explicitly preclude coverage for an "injury ... caused intentionally." For example, contemporary liability insurance policies frequently state that insurance is provided for damages that are causes by an "occurrence" which is generally defined as an "accident" that "results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."
Keeton and Widiss, Insurance Law, § 5.4(d)(1) (1988).
[5] The court must look not only to the facts alleged but to their implications as well in determining whether the complaint may charge a covered occurrence, as this liberal interpretation of the complaint in favor of coverage "is authorized under the principle that any ambiguous term of an insurance policy will be most strongly construed against the insurance company." Continental Cas. Co. v. Florida Power & Light Co., 222 So.2d 58, 59 (Fla. 3d DCA), cert. denied, 229 So.2d 867 (Fla. 1969).
[6] In view of our disposition of this issue, we find it unnecessary to discuss the alternative theories of estoppel and waiver Grissom asserted as legal grounds to extend the statute of limitations beyond five years period, even though these grounds were rejected by the trial court.
[7] This condition reads:

5. Action Against Company: No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.
[8] None of the cases cited in our discussion of this point were brought to the attention of the trial court or this court. Had the trial court been aware of these Florida decisions, we are confident that its ruling on this point would have been otherwise.