[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13172

_____

D.C. Docket No. 8:17-cv-02106-SDM-CPT

THE TRAVELERS INDEMNITY COMPANY
OF CONNECTICUT,

Plaintiff-Appellee,

versus

RICHARD MCKENZIE & SONS, INC.,
HERMANNS REAL ESTATE VENTURES, LLC,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 26, 2021)

Before BRANCH, TJOFLAT, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

It is sometimes said that the only way to find out if you can trust someone is to trust them. As this case proves, there is much truth in that adage. And in a related one, which is that trusting someone can lead to litigation.

## I.  FACTS AND PROCEDURAL HISTORY

When Richard Hermanns bought his first citrus grove in 2009, he hired Richard McKenzie — who had experience with starting and managing citrus groves — to take care of things for him.[1]  He relied on McKenzie for everything: clearing the land, buying the supplies, planting the trees, keeping the trees healthy, maintaining the groves, and picking the fruit.  McKenzie, in turn, billed Hermanns for materials purchased and labor expended.  Hermanns left everything in McKenzie's hands and did not visit the groves often.

Trusting McKenzie was a mistake.  Hermanns would later allege that McKenzie billed him for hundreds of thousands of dollars' worth of trees that were never planted, fertilizer that was never applied, and diesel fuel that was never delivered.  He also stole some of Hermanns' diesel fuel for his own use.  And through his negligence, McKenzie damaged Hermanns' groves:  He planted only 115 trees per acre instead of the industry-standard 150, planted many of the trees

---

[1] Hermanns and McKenzie both acted through their companies, but for simplicity we refer to the parties individually in place of the companies.  Also for simplicity, when describing any action of their attorneys we will refer to the parties themselves.

too deep, failed to apply enough fertilizer and pesticides, failed to dig enough drainage ditches, and generally did a bad job of caring for the trees. Hermanns discovered McKenzie's fraud, theft, and negligence and fired him.

Hermanns eventually convinced the State Attorney's Office in Polk County to charge McKenzie for his alleged fraud and theft, but what happened with that criminal case does not matter given how we are deciding this case. On the civil side of things, Hermanns sued McKenzie in Florida state court. His original complaint alleged facts about McKenzie falsely billing Hermanns and stealing from him, and based on that it asserted claims for breach of contract, breach of fiduciary duty, and an equitable accounting. The complaint had no claim for negligence. Almost a year later, and two days after finding out that McKenzie had an insurance policy issued by Travelers, Hermanns moved to amend the complaint to add a claim for negligence; that motion was granted. Hermanns notified Travelers of the amended complaint against McKenzie. Travelers disclaimed coverage.

In the state court litigation, Hermanns and McKenzie entered into a settlement agreement. They settled the three non-negligence claims for $200,000, which was to be paid by McKenzie personally. But as to the negligence claim, they attempted to bring that part of the settlement within the "Coblentz doctrine," meaning McKenzie would not be on the hook for paying it. Their attempt

3

consisted of agreeing that McKenzie owed to Hermanns $2,965,750 in damages for the negligence claim, but that Hermanns would not try to collect any of the judgment from McKenzie. Instead, Hermanns could only go after Travelers for those damages. As contemplated by their settlement agreement, the state trial court entered a consent judgment awarding Hermanns $2,965,750 on his negligence claim against McKenzie.

Travelers filed this declaratory judgment action against McKenzie and Hermanns in March 2017. It sought a judgment declaring that, based on the insurance policy's provisions, it had no duty to defend against or indemnify McKenzie for Hermanns' original state court complaint, or his amended state court complaint, or the state court consent judgment that had been entered for Hermanns against McKenzie. Travelers also asked the court to rule that the consent judgment was unenforceable because it was the result of collusion between McKenzie and Hermanns and was for an unreasonable amount of money.

Hermanns filed in federal court two counterclaims against Travelers, one alleging breach of contract and one seeking a declaratory judgment. The breach of contract claim was based on Travelers' refusal to defend and indemnify McKenzie against Hermanns' state court lawsuit, which Hermanns claimed Travelers was required to do by McKenzie's insurance policy. The declaratory judgment that Hermanns sought was one stating that the state court consent judgment was

4

enforceable against Travelers. McKenzie later joined Hermanns' counterclaims against Travelers.

Travelers moved for summary judgment on all the claims and counterclaims. Hermanns moved for partial summary judgment, contending that because Travelers breached its duty to defend, it was liable for the costs that McKenzie incurred in defending the state-court action and for the attorney's fees that Hermanns incurred in bringing his counterclaim. Hermanns sought the attorney's fees McKenzie had incurred in defending against Hermanns' lawsuit because in the settlement Hermanns had been assigned all of McKenzie's rights under the insurance policy. McKenzie joined Hermanns' motion for partial summary judgment.

The district court granted summary judgment in favor of Travelers on all of the claims and counterclaims. On the consent judgment issue, the court ruled that it was unenforceable for three independent reasons. First, it was for an unreasonable dollar amount. Second, it was collusive and entered into in bad faith. Third, McKenzie's insurance policy did not cover the allegations in Hermanns' complaint. Explaining the third reason, the court relied on two exclusions in McKenzie's insurance policy, one for damage that the insured "expected or intended" to cause and one for damage caused to real property by the insured's "operations." On the duty to defend counterclaim, the court concluded that those

5

same two policy exclusions meant that Travelers had no duty to defend McKenzie against Hermanns' complaint.

This is McKenzie's and Hermanns' appeal.  They contend that there are genuine issues of material fact concerning the enforceability of the settlement agreement and that they are entitled to summary judgment on Travelers' duty to defend McKenzie against Hermanns' complaint.

## II. ANALYSIS

We start with the duty to defend, and we end there because it also determines the enforceability of the settlement agreement.  If Hermanns and McKenzie lose on the duty to defend, they lose on everything.  And the district court ruled that they lost on the duty to defend.  One of the bases for its ruling was that the damages alleged in Hermanns' amended complaint were not covered by the insurance policy because of applicable policy exclusions.  We agree.  And because there was no duty to defend, there was no wrongful refusal by Travelers to defend McKenzie, which means the settlement agreement is unenforceable.

When an insurance company wrongfully refuses to defend its insured, Florida law lets the insured settle the case himself in exchange for the plaintiff's promise to collect the settlement only from the insurance company.  That type of settlement is called a "Coblentz agreement," named for the Fifth Circuit case that

first approved one.  See Coblentz v. Am. Sur. Co. of N.Y., 416 F.2d 1059 (5th Cir. 1969).[2]

A Coblentz agreement can be enforced only if the plaintiff can make several showings.  The agreements "traditionally ha[ve] occurred where an insurer breaches its duty to defend," Perera v. U.S. Fid. & Guar. Co., 35 So. 3d 893, 900 (Fla. 2010), and the plaintiff must show "coverage, wrongful refusal to defend, and that the settlement was reasonable and made in good faith." Quintana v. Barad, 528 So. 2d 1300, 1301 n.1 (Fla. 3d DCA 1988).  Hermanns' and McKenzie's claims fail at the start: they can show neither coverage nor a wrongful refusal to defend.  And for purposes of this case, the analysis for those two requirements is the same.  Cf. Fun Spree Vacations, Inc. v. Orion Ins. Co., 659 So. 2d 419, 422 (Fla. 3d DCA 1995) ("Since [the insurer] had no duty to defend the insureds, correspondingly, there is no duty to indemnify them nor to pay the consent judgment.").

Under Florida law, "an insurer's duty to defend its insured against a legal action arises when the complaint alleges facts that fairly and potentially bring the suit within policy coverage." Jones v. Fla. Ins. Guar. Ass'n, 908 So. 2d 435, 442–43 (Fla. 2005).  The duty to defend is a broad one, broader than the duty to

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

indemnify, and "[t]he merits of the underlying suit are irrelevant." Mid-Continent Cas. Co. v. Royal Crane, LLC, 169 So. 3d 174, 181 (Fla. 4th DCA 2015). We determine whether an insurer has a duty to defend its insured based only on "the eight corners of the complaint and the policy," id. at 182, and only as the complaint's alleged facts are "fairly read," Fun Spree Vacations, Inc., 659 So. 2d at 421. The "facts" we consider in evaluating the duty to defend come solely from the complaint, regardless of the actual facts of the case and regardless of any later developed and contradictory factual record. Jones, 908 So. 2d at 442–43. "Any doubts regarding the duty to defend must be resolved in favor of the insured," id. at 443, and "where a complaint alleges facts that are partially within and partially outside the coverage of an insured's policy, the insurer is not only obligated to defend, but must defend that entire suit," Sunshine Birds & Supplies, Inc. v. U.S. Fid. & Guar. Co., 696 So. 2d 907, 910 (Fla. 3d DCA 1997). But of course, because the lawsuit must be for something covered by the insurance policy, "the insurer has no duty to defend" when "the pleadings show the applicability of a policy exclusion." State Farm Fire & Cas. Co. v. Tippett, 864 So. 2d 31, 35 (Fla. 4th DCA 2003).

We focus on the specifics of the insurance policy Travelers issued to McKenzie: the coverage provided and the exclusions from that coverage.[3] The policy requires Travelers to "pay those sums that [McKenzie] becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies," and to "defend [McKenzie] against any suit seeking those damages." Doc. 106-1 at 3 (quotation marks omitted).

"However," states the policy, "[Travelers] will have no duty to defend [McKenzie] against any suit seeking damages for bodily injury or property damage to which this insurance does not apply." Id. (quotation marks omitted). The insurance policy specifies a number of situations in which it does not apply. Many of them are listed in part of the policy titled and dedicated to various "exclusions," and we'll refer to those generically as the policy's "standard exclusions." Two are most relevant, the ones labeled 2.j.(5) and 2.j.(6).[4] Both exclude from coverage

---

[3] Travelers actually issued five policies to McKenzie spanning the period from January 11, 2009 through February 11, 2013. Because the five policies were materially identical, both parties refer to them as the "policy," singular. So will we.

[4] Another relevant exclusion is one that excludes coverage for damage "expected or intended from the standpoint of the insured." Because expected or intended damage is plainly excluded from coverage, Travelers had no duty to defend Hermanns' three theft and improper billing claims, which were based on McKenzie's alleged intentional conduct of stealing (through improper billing and other means) gas, trees, and money from Hermanns. If the complaint had alleged that McKenzie's intentional conduct had caused unintentional damage, it might have triggered the duty to defend. See, e.g., Hartford Accident & Indem. Co. v. Beaver, 466 F.3d 1289, 1296–98 (11th Cir. 2006); Grissom v. Com. Union Ins. Co., 610 So. 2d 1299, 1307–08 (Fla. 1st DCA 1992).

9

property damage that was caused by the insured's work.  The exclusions state in full that there is no coverage for property damage to:

> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Doc. 9-5 at 35.

The insurance policy also includes several endorsements that expand coverage in specified ways.  One of the endorsements is called the "Farm Care-Taker Liability Coverage" endorsement.  It extends coverage and the duty to defend "to apply to 'Farm care-taking' operations performed by [McKenzie]." "Farm care-taking" is defined as work done by "one who performs farming operations including: planting, cultivating, harvesting or similar 'farming' operations by an insured."

---

But the complaint doesn't allege facts that can be fairly read as asserting that McKenzie's intentional conduct of theft and improper billing caused any unintended damage.  The only unintended damage the complaint alleges is the damage to Hermanns' groves, and the complaint alleges that McKenzie caused that damage by negligent conduct: underplanting and improperly maintaining the trees.  The alleged damage to the groves is not based on McKenzie's intentional conduct of theft.  Because the intentional conduct claims caused only expected or intended damage, the coverage exclusion for damage "expected or intended from the standpoint of the insured" applied, and those claims did not trigger the duty to defend.  Which is probably why Hermanns added the negligence claim to the complaint in the first place, something he did immediately after learning McKenzie was insured by Travelers.

10

The farm care-taker endorsement expressly states that three of the insurance policy's standard exclusions "do not apply to coverage provided by this endorsement."  The three excluded exclusions are 2.l, 2.m., and 2.j.(6).  The last one of those is the exclusion from coverage of property damage to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."  Of critical importance, however, the farm care-taker endorsement does <u>not</u> include the 2.j.(5) exclusion in the specification of the exclusions that it is excluding.

If the 2.j.(5) exclusion applies to the damages alleged in Hermanns' complaint, as the district court found, then Travelers had no duty to defend or indemnify McKenzie because the insurer has no duty to defend or indemnify when "the pleadings show the applicability of a policy exclusion."  <u>Tippett</u>, 864 So. 2d at 35; <u>see also</u> <u>Fun Spree Vacations, Inc.</u>, 659 So. 2d at 422.  Hermanns and McKenzie put forward two arguments for why the 2.j.(5) exclusion does not apply. Their first argument is that the 2.j.(5) exclusion does not apply because the damages alleged in the complaint do not fall within its terms.  The second is that, even if the alleged damages do fall within 2.j.(5), the exclusion is invalid because the farm care-taker endorsement either "supersedes" it, "conflicts" with it, or results in illusory coverage that requires us to ignore it.

11

We start with whether the damages alleged by the complaint fall within the 2.j.(5) exclusion.  As mentioned, that exclusion applies to property damage to "[t]hat particular part of real property on which you . . . are performing operations, if the 'property damage' arises out of those operations."  The damage alleged in Hermanns' complaint meets each requirement set out in 2.j.(5)'s text.

To begin with, the only property damage — and that is the relevant damage for present purposes — the complaint alleges was caused by McKenzie's negligence is damage to real property, a point that Hermanns and McKenzie concede.  The complaint alleges that Hermanns "incurred damages" that included "having to push [or, clear] between 70 to 100 acres of land" on the citrus grove "to compensate for [McKenzie's] past improper care."  Of course, the actual clearing of the acreage was not the damage that McKenzie caused, but the consequence of and the fix for the damage.  That consequence and fix indicates that McKenzie's negligence, as distinguished from his intentional acts, damaged only the citrus groves, meaning the citrus trees and possibly the land on which they grew; trees, as well as land, are real property under Florida law.  See Richbourg v. Rose, 44 So. 69, 73–74 (Fla. 1907); Bornstein v. Somerson, 341 So. 2d 1043, 1046 (Fla. 2d DCA 1977).

Narrowing the focus, the "particular part of real property" that is excluded from coverage under 2.j.(5) is the property "on which [McKenzie] . . . [was]

12

performing operations." See Am. Equity Ins. Co. v. Van Ginhoven, 788 So. 2d 388, 391 (Fla. 5th DCA 2001) ("[T]he term 'real property' is modified by the terms 'on which you . . . are performing operations.'"). To begin defining "[t]hat particular part of real property," then, we must first define McKenzie's operations. Florida law gives us a general definition: "operations" for 2.j.(5) purposes means "work done in the performance of the insured contractor's contract." Nova Cas. Co. v. Willis, 39 So. 3d 434, 436 (Fla. 3d DCA 2010) (citing Container Corp. of Am. v. Md. Cas. Co., 707 So. 2d 733, 736–37 (Fla. 1998)). According to Hermanns' complaint, McKenzie contracted to "manage, maintain and harvest citrus trees located [on Hermanns'] Grove." Those contractual duties made McKenzie "responsible to ensure that the groves were properly planted, watered, fertilized, treated and harvested," as well as "for the proper repair and maintenance of the Grove drainage canals and irrigation system." The complaint makes plain that McKenzie's "operations" were broad.

The complaint also alleges that the damage happened to the real property "on which" McKenzie was performing operations. See Am. Equity Ins. Co., 788 So. 2d at 391. The only land the complaint refers to is the parcels making up the citrus groves, and the complaint expressly groups all of those parcels together and refers to them collectively as "the 'Groves.'" And, as mentioned, the complaint then identifies McKenzie's "operations" as covering "the Groves." The only fair

13

reading of the complaint is that McKenzie's operations were on all of the property that the complaint alleges was damaged: the groves. There is no other property to which the complaint refers or could be referring when it alleges that McKenzie's negligence "has caused damages to [Hermanns]" that required clearing "70 to 100 acres of land to compensate for the past improper care."

The alleged property damage happened when McKenzie "[was] performing operations." See id. The damage to the citrus groves was done when he underplanted and failed to properly maintain and treat the trees that he did plant. Cf. Carithers v. Mid-Continent Cas. Co., 782 F.3d 1240, 1247 (11th Cir. 2015) ("Property damage occurs when the damage happens, not when the damage is discovered or discoverable.").

Finally, any damage certainly "ar[ose] out of [McKenzie's] operations." "The Supreme Court of Florida has concluded that the phrase 'arising out of' is not ambiguous and has a broad meaning, even when used in a policy exclusion." Zucker for BankUnited Fin. Corp. v. U.S. Specialty Ins. Co., 856 F.3d 1343, 1349 (11th Cir. 2017) (citing Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co., 913 So. 2d 528, 539 (Fla. 2005)). The phrase requires merely that "there [is] 'some causal connection, or relationship' that is 'more than a mere coincidence' but proximate cause is not required." James River Ins. Co. v. Ground Down Eng'g, Inc., 540 F.3d 1270, 1275 (11th Cir. 2008) (quoting Taurus Holdings, 913 So. 2d at 539).

14

The complaint alleges that kind of causal connection between the property damage and McKenzie's operations.

Hermanns and McKenzie alternatively argue that even if the property damage alleged in the complaint falls within the terms of the 2.j.(5) exclusion standing alone, the farm care-taker endorsement makes the exclusion either inapplicable or invalid. We disagree. Regardless of how the farm care-taker endorsement may change other aspects of the policy, it does not change the outcome of this appeal.

When interpreting an insurance policy under Florida law, we bear in mind several interpretive principles. We must interpret the policy's terms "in accordance with the plain language of the policies as bargained for by the parties." Prudential Prop. & Cas. Ins. Co. v. Swindal, 622 So. 2d 467, 470 (Fla. 1993). When "a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." Taurus Holdings, 913 So. 2d at 532 (quotation marks omitted). We "may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." Id. (quotation marks omitted). That means "[w]hen contractual language is clear and unambiguous, [we] cannot indulge in construction or interpretation of its plain meaning." Detroit Diesel Corp. v. Atl. Mut. Ins. Co., 18 So. 3d 618, 620 (Fla. 4th DCA 2009).

15

While ambiguities are construed in favor of coverage, "a true ambiguity exists only when the language at issue is reasonably susceptible to more than one interpretation." City of Pompano Beach v. Beatty, 222 So. 3d 598, 600 n.1 (Fla. 4th DCA 2017) (quotation marks omitted).  But "a true ambiguity does not exist merely because a document can possibly be interpreted in more than one manner." Lambert v. Berkley S. Condo. Ass'n, Inc., 680 So. 2d 588, 590 (Fla. 4th DCA 1996) (emphasis added).  And a "provision is not ambiguous simply because it is complex or requires analysis." Garcia v. Fed. Ins. Co., 969 So. 2d 288, 291 (Fla. 2007).  "While 'insurance policies may be confusing to persons not trained or experienced in the form and language of insurance policies[,] . . . . that fact does not make such policies or language legally ambiguous.'" Zucker, 856 F.3d at 1348 (quoting Fla. Ins. Guar. Ass'n v. Sechler, 478 So. 2d 365, 367 (Fla. 5th DCA 1985)) (brackets and ellipsis in original).

With those interpretive principles in mind, we turn again to McKenzie's insurance policy.  To start, far from "superseding" or rendering 2.j.(5) inapplicable, the plain meaning of the farm care-taker endorsement is that the 2.j.(5) exclusion applies to the endorsement's coverage.  The endorsement expressly lists three exclusions that "do not apply to coverage provided by this endorsement."  None of those three is 2.j.(5).  By expressly stating that three of the standard exclusions do not apply, and specifying which ones they are, the implication is that all the

16

remaining, unincluded or unspecified exclusions <u>do apply</u>. <u>See, e.g.</u>, <u>Shumrak v. Broken Sound Club, Inc.</u>, 898 So. 2d 1018, 1020 (Fla. 4th DCA 2005) ("It is a fundamental principle of contract construction, . . . that the expression of one thing is the exclusion of the other.") (quotation marks omitted).

The most common-sense and natural reading of the endorsement is that it does not silently exempt itself from the policy's full and long list of standard exclusions, except as specified. One set of the standard exclusions in the policy, for example, has to do with pollution. It would be passing strange if the farm care-taker endorsement, without saying so, gave an insured free rein to pollute on Travelers' dime. Hermanns and McKenzie don't expressly argue that the pollution exclusions are inapplicable, but the logic of their argument about 2.j.(5)'s inapplicability would require that to be true. The endorsement lists some exclusions as not applying and does not mention any of the other exclusions. The 2.j.(5) exclusion is not mentioned, just as the pollution exclusions are not. If the endorsement somehow makes 2.j.(5) inapplicable, then it must do the same for all the other unmentioned standard exclusions. That odd interpretation and outcome have no basis in the endorsement's text. The much better interpretation is that all of the standard exclusions continue to apply to the coverage given by the endorsement, except for those exclusions expressly listed as not applying.

17

To escape the impact of 2.j.(5), Hermanns and McKenzie advance another argument: "conflict." They argue that an endorsement extending coverage to the insured's farm care-taker operations conflicts with 2.j.(5)'s exclusion of real property damage caused by the insured's operations. But an insurance policy can both provide coverage and also exclude some things that might otherwise fall within that coverage. That's not a conflict. It's just an exclusion, and those are par for the insurance course. See Cynergy, LLC v. First Am. Title Ins. Co., 706 F.3d 1321, 1327 (11th Cir. 2013) ("But that is the nature of an exclusion — to exclude things that otherwise would be covered, when certain conditions are met."). And it is not surprising that the provision giving coverage and the provision excluding things from that coverage might use the same word, "operations." That is, after all, a good way to be clear about what coverage is having an exclusion carved out of it.

In light of that, the plain meaning of the provisions is clear. The farm care-taker endorsement and the 2.j.(5) exclusion taken together mean that coverage extends to property damage caused by the insured's farm care-taker operations, but not if the damage is to real property, such as citrus groves.

Hermanns' and McKenzie's rejoinder to this reading of the policy is that it makes the coverage provided by the farm care-taker endorsement illusory. The law of Florida about illusory insurance coverage works like this. As we have mentioned, "when insurance policies are ambiguous, Florida courts construe them

18

in favor of coverage." Zucker, 856 F.3d at 1352. And a policy is "ambiguous" when a coverage provision and an exclusion are directly at odds, "leaving the insured to wonder which provision correctly explained the scope of his coverage." Id. The ambiguity is resolved "by ignoring the exclusion." Id. (citing Tire Kingdom, Inc. v. First S. Ins. Co., 573 So. 2d 885, 887 (Fla. 3d DCA 1990)). But if the policy's coverage and exclusion provisions do not negate one another, the coverage is not illusory, and there is no ambiguity, so the plain language of the exclusion controls. See Warwick Corp. v. Turetsky, 227 So. 3d 621, 625–26 (Fla. 4th DCA 2017).

Coverage is illusory under Florida law only if the insurance policy grants coverage with one hand and then with the other completely takes away the entirety of that same coverage. Completeness is key. "'When limitations or exclusions completely contradict the insuring provisions, insurance coverage becomes illusory.'" Id. at 625 (quoting Purrelli v. State Farm Fire & Cas. Co., 698 So. 2d 618, 620 (Fla. 2d DCA 1997) (emphasis added). "A policy is illusory only if there is an internal contradiction that completely negates the coverage it expresses to provide," id. (emphasis added), or if the exclusion "'completely swallow[s] the insuring provision,'" id. (quoting Auto-Owners Ins. Co. v. Christopher, 749 So. 2d 581, 582 (Fla. 5th DCA 2000)) (emphasis added). The Fourth District Court of Appeal summed it up this way: "We also conclude that the excess policy is not

19

illusory because the terms of [it] do not 'completely contradict' each other, and [it] does not completely negate the entirety of coverage it purportedly provides." Id. at 623 (emphasis added); see also Purrelli, 698 So. 2d at 620, 621 (holding coverage illusory when "the exclusion completely swallowed up the insuring provision") (emphasis added).

But there is a dispositive difference between complete contradiction or complete negation and merely excepting some or many or even most things from coverage. Coverage is not illusory if the policy "simply excludes coverage for a subset of claims that would ordinarily fall within the policy's insuring provisions." Zucker, 856 F.3d at 1352. And an exclusion that "completely swallows" coverage is not the same as one that takes a nibble, or even a big bite, out of it. Exclusions can be "significant" without "completely contradict[ing] the insuring provisions." Warwick, 227 So. 3d at 626 (quoting Interline Brands, Inc. v. Chartis Specialty Ins. Co., 749 F.3d 962, 967 (11th Cir. 2014)); see also Zucker, 856 F.3d at 1353 ("The Prior Acts Exclusion excludes a lot of coverage, but not all coverage."). Exclusions do not render coverage illusory even if they make the coverage depend on "extraordinary circumstances" that are "unlikely" to occur. Warwick, 227 So. 3d at 626.

The difference can be illustrated with examples. An insurance policy that "purport[s] to cover certain intentional torts, but exclude[s] intended acts" is

20

illusory.  Id. at 625 (citing Purrelli, 698 So. 2d at 619–20).  So is a policy that states it "cover[s] parasailing but exclude[s] watercrafts."  Id. (citing Certain Underwriters at Lloyds v. Waveblast Watersports, Inc., 80 F. Supp. 3d 1311, 1318–19 (S.D. Fla. 2015)).  In those situations, the category of coverage is smaller than the category of exclusion; it's impossible to do the covered activity without also doing the excluded activity.

On the other hand, a policy is not illusory if it covers "advertising injury" but excludes advertising injury arising out of a violation of "any statute, ordinance or regulation"; that's just a coverage provision with an exception, even if the exception is a "significant" one.  Id. (quoting Interline Brands, Inc., 749 F.3d at 967).  A policy also is not illusory when it excludes all claims for incidents arising out of conduct occurring before a certain date, such as barring coverage for losses arising out of bank officers' pre-November 2008 conduct, even when those are the very claims most likely to be made.  See Zucker, 856 F.3d at 1346, 1352.  In those situations, the category of coverage is bigger than the category of exclusion; it is possible to do the covered activity without also doing the excluded activity.

Those examples demonstrate why, under Florida law, exclusion 2.j.(5) does not render the farm care-taker endorsement illusory.  It does not because even with the 2.j.(5) exclusion, the endorsement still provides coverage.  2.j.(5) excludes coverage only for damage to real property, but the farm care-taker endorsement's

21

coverage is not so limited; it applies to "property damage" not just "real property damage." Unlike an intentional tort, which cannot be done without an intentional act, or parasailing, which cannot be done without a watercraft, property damage <u>can</u> be done without real property damage. The category of coverage, all property, is bigger than the category of exclusion, real property. There's nothing complete about that exclusion; real property damage is "a <u>subset</u> of [what] would ordinarily fall within the policy's insuring provisions." <u>Id.</u> at 1352.

The context of "farm care-taking operations" does not change that because those operations may damage non-real property. McKenzie's operations, as alleged in Hermanns' complaint, suggest one way that farm care-taker operations could damage non-real property. The complaint alleged that McKenzie stole diesel fuel belonging to Hermanns, indicating that McKenzie's use of diesel was part of his farm care-taking operations. In light of that, consider this variation of the facts: Assume that instead of stealing the diesel fuel, McKenzie had negligently spilled it in the performance of his farm care-taker operations. Had he done so, that would be property damage to the diesel fuel that is not included in damage to "[t]hat particular part of real property on which" McKenzie was operating.[5] In that

---

[5] The policy's definition of "property damage" includes the "loss of use" of property, like the loss of the use of spilled diesel.

situation, 2.j.(5) would not exclude coverage for the loss of diesel fuel, even if it might exclude coverage for damage to the land on which the diesel was spilled.

There are other possible examples that prove the same point. Farm care-takers could negligently damage expensive tractors, machinery, or tools that are not real property. Or in negligently "planting" crops they might damage seeds or seedlings that are property but not real property. Or in "cultivating" and "harvesting" they could damage crops that are property but not real property. The point is that the farm care-taker endorsement and the 2.j.(5) exclusion do not "completely contradict" each other, which means that coverage is not illusory, and there is no ambiguity created by those two provisions, which in turn means we must enforce the exclusion according to its unambiguous terms. See Warwick, 227 So. 3d at 625–26.

We do not know if negligent farm care-taking operations are more likely to damage real property than non-real property. But even if they are, that does not mean the coverage the endorsement provides is illusory. See id. at 626; Zucker, 856 F.3d at 1346, 1352.

It may be that McKenzie does not like the terms of the insurance coverage that he purchased; he may wish that he had purchased different coverage. "But after the fact wishes are not enough to change before the fact choices," Zucker, 856 F.3d at 1353, and we have no authority to rewrite insurance contracts to cure

23

buyer's remorse.  See Warwick, 227 So. 3d at 626 ("[The insured] 'chose to buy the policy that it bought.  It cannot change that choice now.'") (quoting Zucker, 856 F.3d at 1353).  Our duty is to enforce the unambiguous terms of the insurance policy, see, e.g., Taurus Holdings, 913 So. 2d at 532, even if they "may be confusing to persons not trained or experienced in the form and language of insurance policies," Zucker, 856 F.3d at 1348 (quotation marks omitted).

In summary, the 2.j.(5) exclusion does not render the farm care-taker endorsement illusory.  It does not completely swallow the coverage.  It does not completely contradict the coverage.  It does not completely negate the coverage. It merely excepts from that coverage damage to real property.  Even if that is a significant exclusion, it is not a complete one, so the coverage is not illusory. Because the negligence claim in Hermanns' amended complaint alleges only damage that falls within the 2.j.(5) exclusion, Travelers had no duty to defend McKenzie against Hermanns' lawsuit, and there was no loss coverage.

## III.  CONCLUSION

Because the insurance policy excluded coverage for the damages alleged in Hermanns' amended state court complaint, Travelers had no duty to defend or indemnify, and the Coblentz agreement is unenforceable for that reason.  We affirm the district court's grant of summary judgment in favor of Travelers.

**AFFIRMED.**

24