**LAWYERS TITLE INSURANCE CORP., Plaintiff–Appellee,**

v.

**JDC (AMERICA) CORP., Defendant–Appellant.**

No. 93–4436.

United States Court of Appeals, Eleventh Circuit.

May 31, 1995.

---

Hugo L. Black, Jr., Kelly Black Black Byrne & Beasley, P.A., Miami, FL, for appellant.

Stuart H. Singer, Kirkpatrick & Lockhart, Ronald M. Rosengarten, Greenberg Traurig Hoffman, Lipoff Rosen & Quintel, P.A., Miami, FL, John E. McDonald, Jr., Lawyers Title Ins. Corp., Richmond, VA, D. Daniel Barr, Peter Glatz Rush, Bell, Boyd & Lloyd, Chicago, IL, for appellee.

Before TJOFLAT, Chief Judge, COX, Circuit Judge, and YOUNG *, Senior Circuit Judge.

* Honorable George C. Young, Senior U.S. District Judge for the Middle District of Florida, sitting by designation.

TJOFLAT, Chief Judge:

This diversity case involves a dispute between Lawyers Title Insurance Corporation ("Lawyers Title") and JDC (America) Corporation ("JDC"). Lawyers Title issued two title policies insuring mortgages held by JDC as mortgagee. JDC sought to foreclose on the two mortgages in state court; one of the defendants filed a motion and several affirmative defenses that, in JDC's opinion, triggered Lawyers Title's duty to defend under the two title policies. Lawyers Title disagreed and filed this suit seeking a declaration that it had no duty to defend. The district court concluded that Lawyers Title had no duty to represent JDC in the foreclosure action and, therefore, granted summary judgment in favor of Lawyers Title. Because we also conclude that none of the defenses asserted in the foreclosure action are covered by either of the two policies, we affirm.

I.

A.

Lawyers Title furnished the two title policies at issue in this case as a result of an agreement between JDC and Brickell Station Towers, Inc. ("BST") to develop a parcel of real property near downtown Miami, Florida. AmeriFirst Florida Trust Company ("AmeriFirst") held fee simple title to the property as trustee pursuant to a warranty deed executed under an unrecorded trust agreement. The unrecorded trust agreement to which the warranty deed referred named BST as the sole beneficiary with the right to direct AmeriFirst's disposition of the property. In November 1984, JDC and BST signed an agreement to develop the property. JDC agreed to finance the first of two phases of development by borrowing funds from The Saitama Bank, Ltd. ("Saitama") and Mitsui Trust & Banking Co., Ltd. ("Mitsui"), two Japanese lenders, and reloaning the money to BST. The parties contemplated that a third lender, Citicorp Real Estate, Inc. ("Citicorp"), would furnish a "take-out loan" pay-

ing off JDC's short-term construction loan when construction of the first phase of the development was completed. In exchange for JDC's arranging the financing of the first phase of development, BST agreed to give JDC twenty-five percent of BST's beneficial interest in the AmeriFirst land trust and appointed JDC as the general contractor for the first and second phases of development. JDC and BST also agreed to form a joint venture to implement their development agreement.

The parties formed their joint venture as planned on January 17, 1985. BST assigned its beneficial interest in the AmeriFirst land trust to the joint venture and took a seventy-five percent interest in the joint venture; JDC took the remaining twenty-five percent interest. The joint venture agreement provided that the parties were to exercise equal control over the joint venture's development activities, but gave BST specific authority to sign, on behalf of the joint venture, the loan documents necessary to finance the first phase of development.

The day after the parties formed their joint venture, BST, on behalf of the joint venture, executed two promissory notes in favor of JDC. The total principal value of the two notes was $38,000,000.[1] Both notes were to become due in full on July 18, 1988, but each note provided that, if it were assigned to Citicorp, the take-out lender, its maturity date would be sixty days from the date of the assignment. In conjunction with the execution of each note, AmeriFirst and BST, on behalf of the joint venture, executed a mortgage and security agreement that: (1) established a mortgage on the trust's property as security for each note; and (2) created a security interest in all fixtures and person-

alty located on the property as security for each note.[2] Although each mortgage acknowledged that AmeriFirst was the fee simple owner of the mortgaged property, each mortgage referred to both AmeriFirst and BST collectively as the "Mortgagor." JDC assigned the mortgages, security interests, and notes to Saitama the day JDC received them.[3] The mortgages were filed in Dade County on January 24, 1985, and, pursuant to its previous commitments to insure the mortgages, Lawyers Title issued two title policies to JDC.

The development of the property did not proceed as planned. After making at least forty-five loan disbursements for construction, Saitama reassigned the mortgages, security agreements, and notes to JDC in exchange for payment of JDC's loans in a document dated July 18, 1988.[4] On September 30, 1988, JDC filed a four-count complaint in the Circuit Court for Dade County against AmeriFirst, the joint venture, and BST as a general partner (with JDC) of the joint venture [hereinafter the "Foreclosure Action"]. JDC's complaint alleged that the joint venture and AmeriFirst had defaulted on the notes and sought to foreclose on the mortgages and security interests in fixtures and personalty. Counts I and III of the complaint sought to foreclose on the mortgages; Counts II and IV sought to foreclose on the security interests. On October 11, 1988, BST, on behalf of the joint venture, filed a self-styled "Motion to Quash Mortgage and Memorandum of Law in Support Thereof" [hereinafter the "Motion to Quash"]. BST argued in its Motion to Quash that JDC's status as a general partner of the joint venture prevented JDC from foreclos-

---

1. One note, the "Ceiling Promissory Note," was for $28,000,000; the other, the "Superseding Promissory Note," was for $10,000,000.

2. The "Mortgage and Security Agreement" established a mortgage and security interest in fixtures and personalty securing the joint venture's obligations under the Ceiling Promissory Note. The "Consolidated Mortgage and Security Agreement" established a mortgage and a security interest in fixtures and personalty securing the joint venture's obligations under the Superseding Promissory Note. JDC filed UCC–1 financing statements with the Secretary of State for the

security interests in fixtures and personalty. JDC also took as security an assignment of the joint venture's 100% beneficial interest in the AmeriFirst land trust and filed a UCC–1 financing statement covering that security interest.

3. Saitama took the assignment on behalf of itself and as an agent of Mitsui.

4. The record does not reveal whether Saitama disbursed the funds to the joint venture, BST, or JDC.

ing.[5] In its combined answer and affirmative defenses, filed on December 21, 1988, BST made similar claims based on the same premise: that JDC's status as a general partner prevented it from foreclosing.[6] BST later filed a counterclaim that contained claims for, among other things, usury, breach of contract, racketeering, breach of fiduciary duty, and fraud. JDC does not argue that any of these claims implicate the title policies. Unlike BST, AmeriFirst did not actively seek to defeat the foreclosure action; it eventually filed an answer admitting that it owned the property as a trustee and that it had executed the mortgage documents, but denying for lack of knowledge all other paragraphs of JDC's complaint. AmeriFirst did not assert any affirmative defenses.

On November 4, 1988, JDC notified Lawyers Title by letter of BST's Motion to Quash, stating that "[BST] is seeking to have the two mortgages declared invalid and unenforceable because JDC is the lender/insured mortgagee and is likewise a general partner in [the] Joint Venture...." Lawyers Title responded by retaining a law firm to defend JDC and notified JDC by letter that it had done so. In this letter, Lawyers Title reserved its rights to deny coverage under the title policies.

5. BST argued in its Motion to Quash that "[JDC's] attempted foreclosure of the mortgage breaches the duty of loyalty and good faith owed by one partner to another" and "[b]ecause the attempted foreclosure violates [JDC's] fiduciary obligations and wrongfully seeks to circumvent an accounting, the mortgage must be quashed."

6. Specifically, BST disputed JDC's ability to foreclose in its first, third, fourth, and fifth affirmative defenses. These affirmative defenses stated:

*FIRST DEFENSE*
*FAILURE TO STATE A CAUSE OF ACTION*
The Complaint fails to state a cause of action against BST and the Joint Venture because JDC is jointly liable on the mortgage as a joint venture partner and as such cannot foreclose a mortgage against the partnership. ·
. . . .
*THIRD DEFENSE*
*FAILURE TO STATE A CAUSE OF ACTION*
The Complaint fails to state a cause of action because JDC failed to name each partner of the Joint Venture as a defendant. Thus, JDC has failed to name an indispensable party-defendant.

A dispute quickly ensued over the law firm Lawyers Title had chosen to represent JDC.[7] The parties exchanged numerous letters and met on several occasions in efforts to resolve their dispute, but these efforts were unsuccessful. In early 1989, the parties' impasse expanded to include a disagreement over the scope of defense that Lawyers Title was obligated to provide. Lawyers Title contended that, because many of the issues in the Foreclosure Action were separable from the issues raised in the "covered" claims, the cost of defense was readily apportionable and Lawyers Title should only have to provide a defense for the covered claims. JDC countered that Lawyers Title was obligated under Florida law to pay for the entire Foreclosure Action.

Meanwhile, JDC chose to file a separate lawsuit in the Circuit Court for Dade County against BST and its stockholders concerning breaches of the joint venture agreement [hereinafter the "Partnership Action"]. JDC filed the Partnership Action on March 2, 1989 and the case was assigned to the same trial judge assigned to the Foreclosure Action. Soon thereafter, JDC filed a motion to consolidate the Foreclosure Action and the Partnership Action into a single proceeding. The trial judge denied JDC's motion to consolidate, but then granted JDC's motion for

*FOURTH DEFENSE*
*LACK OF SUBJECT MATTER JURISDICTION*
This Court lacks subject matter jurisdiction because JDC as both plaintiff and as a general partner of the Joint Venture is both plaintiff and defendant in this action.
*FIFTH DEFENSE*
*ESTOPPEL*
JDC is estopped from foreclosing the mortgage because it caused the alleged default creating the right to foreclose. Specifically, JDC as a general partner is jointly liable on all partnership debts to creditors. JDC's refusal to repay the loan as a general partner estops JDC from foreclosing the mortgage.

7. JDC was dissatisfied with Lawyers Title's choice of firm because the selected firm often represented Lawyers Title in its affairs. This involvement with Lawyers Title, combined with Lawyers Title's reservation of rights under the title policies, made JDC uneasy about the firm's ability adequately to represent JDC, and JDC wanted Lawyers Title to retain the firm that was already representing JDC in the Foreclosure Action.

leave to amend its complaint in the Foreclosure Action. On September 9, 1989, JDC filed an amended complaint that contained: (1) the original four foreclosure claims; (2) all of the claims from its complaint in the Partnership Action; and (3) one new claim related to the partnership dispute. BST filed an amended answer in response to JDC's amended complaint. In this amended answer, BST added two new affirmative defenses to the fifteen it had previously asserted. BST contended in its seventeenth affirmative defense that the mortgages should be quashed because Florida law prohibits a joint venturer from acquiring a lien against a partner's assets and attempting to foreclose on that lien.[8]

JDC and Lawyers Title never resolved their dispute. As we discuss more fully below, on May 24, 1989, Lawyers Title brought this action seeking a declaration that it had no duty to defend JDC in the Foreclosure Action. Meanwhile, JDC notified Lawyers Title in late 1989 that, although the possibility that BST's defenses would prevent JDC from foreclosing on the mortgages was small, the potential loss was great because both promissory notes were nonrecourse notes. JDC stated that, because of the magnitude of the potential loss and the expense of pursuing the case, JDC would commence settlement negotiations with BST. On October 27, 1990, JDC and BST settled both the Foreclosure Action and the Partnership Action. In exchange for JDC's payment of a seven-figure sum to BST, BST dismissed its affirmative defenses and counterclaims, assigned all beneficial interests in the AmeriFirst trust to JDC, and assigned all rights and interests in the joint venture to JDC. After JDC and BST settled, JDC demanded that Lawyers Title indemnify JDC for the costs of settlement in addition to reimbursing JDC for attorneys fees incurred in pursuing the Foreclosure Action.

### B.

As noted above, on May 24, 1989, Lawyers Title filed a complaint seeking a declaration that it had no duty to defend and no duty to indemnify JDC with respect to the Foreclosure Action. JDC filed an answer and a counterclaim with a single claim in which JDC alleged that Lawyers Title breached the terms of its title policies by refusing to defend JDC. On March 5, 1990, after filing an amended complaint, Lawyers Title filed a motion for summary judgment as to its claim; shortly thereafter, JDC filed a motion for partial summary judgment as to Lawyers Title's claim and JDC's counterclaim.

After JDC settled the state court litigation and Lawyers Title refused JDC's demand that Lawyers Title indemnify JDC for the cost of the settlement, JDC obtained leave to amend its counterclaim and added a breach of contract claim seeking indemnification. Lawyers Title filed a motion to dismiss this claim or, in the alternative, for summary judgment on the claim. On March 18, 1993, the district court issued a memorandum opinion and order granting summary judgment in favor of Lawyers Title and denying JDC's motion for partial summary judgment. *See Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 818 F.Supp. 1543 (S.D.Fla.1993). JDC now appeals.

### II.

We review the district court's grant of summary judgment *de novo*, applying the same legal standards that bound the district court. *Reserve, Ltd. v. Town of Longboat Key*, 17 F.3d 1374, 1377 (11th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 729, 130 L.Ed.2d 633 (1995). Summary judgment is appropriate in cases in which there is no genuine issue of material fact. Fed.R.Civ.P. 56(c).

The district court relied on two alternative theories in granting summary judgment in

---

8. BST's seventeenth affirmative defense stated:
    *SEVENTEENTH DEFENSE*
    *QUASHING THE MORTGAGE*
    68. JDC obtained the mortgages which it seeks to foreclose by purchasing them from Bank Saitama, Ltd. Under Florida law, a j[o]int venture partner may not, consistent with its fiduciary duties to its partner, acquire a lien against the joint venture and then attempt to foreclose the lien against the joint venture. Therefore, mortgages should be quashed.
    The first, third, fourth, and fifth affirmative defenses remained essentially unchanged.

favor of Lawyers Title. First, the district court concluded that BST's claims did not attack the mortgage in a manner covered by the policies. *Lawyers Title*, 818 F.Supp. at 1546–48. Second, the district court concluded that, even if BST's claims were covered, a policy exclusion applied. *Id.* at 1546.[9] Because we also conclude that the policies did not cover BST's attacks, we need only address the district court's first ground of decision.

### A.

■ Contract interpretation is generally a question of law. *Gibbs v. Air Canada*, 810 F.2d 1529, 1532 (11th Cir.1987); *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1477 (11th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 966, 122 L.Ed.2d 122 (1993); *Zaklama v. Mount Sinai Medical Ctr.*, 906 F.2d 650, 652 (11th Cir.1990) (per curiam). Questions of fact arise only when an ambiguous contract term forces the court to turn to extrinsic evidence of the parties' intent, such as precontract negotiations, to interpret the disputed term. *Thornton v. Bean Contracting Co.*, 592 F.2d 1287, 1290 (5th Cir.1979); *see also In re Stratford*, 635 F.2d 365, 368 (5th Cir.1981) ("[T]he determination of the parties' intent from extrinsic evidence is a question of fact rather than one of law.").[10] Such an ambiguity, however, "does not exist merely because a contract can possibly be interpreted in more than one manner." *Shipner v. Eastern Air Lines, Inc.*, 868 F.2d 401, 409 (11th Cir.1989) (applying Florida law) (citing *American Medical Int'l, Inc. v. Scheller*, 462 So.2d 1, 7 (Fla. 4th Dist.Ct.App.1984), *review denied*, 471 So.2d 44 (Fla.1985), *cert. denied*, 474 U.S. 947, 106 S.Ct. 345, 88 L.Ed.2d 292 (1985)); *see also Saha v. Aetna Casualty & Sur. Co.*, 427 So.2d 316, 317 (Fla. 5th Dist.Ct.App.1983) ("[T]his principle applies only when there exists a genuine inconsistency, uncertainty or. ambiguity in meaning after

resort to the ordinary rules of construction.").

■ JDC contends that Lawyers Title had a duty to defend against BST's assertions in the Foreclosure Action because those allegations attacked the enforceability of the covered mortgages. The duty to defend depends solely on the facts and legal theories alleged in the pleadings and claims against the insured. *National Union Fire Ins. Co. v. Lenox Liquors, Inc.*, 358 So.2d 533, 536 (Fla.1977); *see also Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.*, 470 So.2d 810, 813 (Fla. 1st Dist.Ct.App.1985) (collecting cases). The duty arises when the relevant pleadings allege facts that "fairly and potentially bring the suit within policy coverage." *Lime Tree Village Community Club Ass'n, Inc. v. State Farm Gen. Ins. Co.*, 980 F.2d 1402, 1405 (11th Cir.1993) (applying Florida law) (citing *Trizec Properties, Inc. v. Biltmore Constr. Co.*, 767 F.2d 810, 811–12 (11th Cir.1985); *Baron Oil*, 470 So.2d at 815). " '[T]he "actual facts" of the situation are not pertinent.' " *Baron Oil*, 470 So.2d at 814 (alteration added) (quoting *Federal Ins. Co. v. Applestein*, 377 So.2d 229, 233 (Fla.3d Dist.Ct.App.1979); citing *Lenox Liquors*, 358 So.2d at 536); *see also id.* ("When the actual facts are inconsistent with the allegations in the complaint, the allegations in the complaint control in determining the insurer's duty to defend."). Thus, the duty to defend is broader than the duty to indemnify in the sense that the insurer must defend even if facts alleged are actually untrue or legal theories unsound. *Trizec*, 767 F.2d at 812; *Grissom v. Commercial Union Ins. Co.*, 610 So.2d 1299, 1307.(Fla. 1st Dist.Ct.App.1992), *review denied*, 621 So.2d 1065 (Fla.1993); *Logozzo v. Kent Ins. Co.*, 464 So.2d 605, 607 (Fla. 3d Dist.Ct.App.1985); *Klaesen Bros., Inc. v. Harbor Ins. Co.*, 410 So.2d 611, 612–13 (Fla. 4th Dist.Ct.App. 1982). If an examination of the allegations of the complaint leaves any doubt regarding the insurer's duty to defend, the issue is resolved

---

9. The policies excluded "[d]efects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed or agreed to by the insured claimant...." The district court concluded that this exclusion applied because JDC and BST's joint venture agreement provided the foundation for BST's defenses. *Id.*

10. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent·all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

in favor of the insured. *Lime Tree,* 980 F.2d at 1405; *Baron Oil,* 470 So.2d at 814 (citing *New Amsterdam Casualty Co. v. Knowles,* 95 So.2d 413 (Fla.1957)); *Grissom,* 610 So.2d at 1307. Thus, we turn to the question at hand: whether the pleadings filed by BST in the underlying state case alleged facts and legal theories within the coverage provisions of the two title policies.

### B.

■ To determine whether the district court correctly held that, as a matter of law, BST's claims did not attack the mortgages in a manner covered by the policies, we must first decide whether the disputed terms of the policy are unambiguous. If we find the provisions unambiguous, we then examine the facts and theories alleged in the pleadings to determine whether, if BST had prevailed on its affirmative defenses or its Motion to Quash, the loss would have been covered under the relevant policy provisions.[11]

### 1.

The two policies are identical in all relevant respects. JDC contends that the following provisions obligated Lawyers Title to defend JDC in the Foreclosure Action:

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS CONTAINED IN SCHEDULE B AND THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS HEREOF, LAWYERS TITLE INSURANCE CORPORATION ... insures ... against loss or damage ... sustained or incurred by the insured by reason of:

. . . .

5. The *invalidity or unenforceability* of the lien of the insured mortgage upon said estate or interest except to the extent that such invalidity or unenforceability, or claim thereof, arises out of the transaction evidenced by the insured mortgage and is based upon (a) usury,

or (b) any consumer credit protection or truth in lending law. . . .

. . . .

### CONDITIONS AND STIPULATIONS

. . . .

3. Defense and Prosecution of Actions—Notice of Claim to be given by an Insured Claimant

(a) The Company, at its own cost and without undue delay, shall provide for the defense of an insured in all litigation consisting of actions or proceedings commenced against such insured, or defenses, restraining orders, or injunctions interposed against a foreclosure of the insured mortgage or a defense interposed against an insured in an action to enforce a contract for a sale of the indebtedness secured by the insured mortgage, or a sale of the estate or interest in said land, to the extent that such limitation is founded upon an alleged defect, lien, encumbrance, or *other matter insured against by this policy.*

(emphasis added).

Relevant parts of Schedule A stated:

Name of Insured:

JDC (AMERICA) CORP.

The estate or interest in the land described in this Schedule and which is encumbered by the insured mortgage is:

Fee Simple

The estate or interest referred to herein is at Date of Policy vested in:

AMERIFIRST FLORIDA TRUST COMPANY, as Trustee, under unrecorded Trust Agreement dated February 25, 1984

The mortgage, herein referred to as the insured mortgage, and the assignments thereof, if any, are described as follows:

[descriptions of the first and second mortgage agreements, respectively][12]

---

**11.** These two issues are not entirely independent of one another. We believe, however, that they are best discussed separately.

**12.** Because the Consolidated Mortgage and Security Agreement was superior to the Mortgage and Security Agreement, the title policy for the Mortgage and Security Agreement listed the Consolidated Mortgage and Security Agreement as an exception on its Schedule B.

The Supreme Court of Florida has defined the scope of a coverage provision similar to the provision at issue in this case. In *Bank of Miami Beach v. Fidelity & Casualty Co.,* 239 So.2d 97 (Fla.1970), the plaintiff mortgagee sought coverage under a title policy that provided that "the insuror 'guarantees' that the mortgage covered by the policy 'has been executed in accordance with law' and 'further guarantees' that said mortgage 'constitutes a valid mortgage lien on the property described in said mortgage.'" *Id.* at 98. The plaintiff had sought to foreclose on the insured mortgage in a previous action, and the mortgagor had contended that, although she had executed the mortgage, her son had forged the promissory note on which the mortgage was based. After settling the foreclosure action, the plaintiff filed suit against the title company seeking indemnification for its losses. *Id.* at 99.

At the outset, the supreme court rejected the defendant title company's argument that the title policy insured only against defects in the mortgagor's title. The court concluded that the language of the policy insured against an invalidly executed mortgage as well. *Id.* at 99 (citing *Ferrell v. Inter–County Title Guar. & Mortgage Co.,* 213 So.2d 518 (Fla.3d Dist.Ct.App.1968)).[13] The court decided, however, that the forged note was *not* a covered risk. The court explained its rationale in a critical passage:

> [A] mortgage lien and a mortgage debt are two entirely different legal concepts or "species." A provision guaranteeing that the mortgage constituted a "valid mortgage lien" might be held to cover a loss resulting from fraud, mistake, duress, or misrepresentation in the procurement of the *mortgage*—a point that is not presented nor decided here; but such a guarantee of the validity of the mortgage *lien* cannot

and should not be construed as guaranteeing that the insuror has made a careful investigation of the origin of the mortgage *debt* and guarantees its payment or validity. If such coverage is contemplated, the policy should specifically so provide.

*Id.* at 99; *cf. Goode v. Federal Title & Ins. Corp.,* 162 So.2d 269, 270 (Fla.2d Dist.Ct. App.1964) ("[I]t must be borne in mind that a title policy insuring a mortgagee insures only the title to the lands securing his debt and not the debt...." (quoting 60 A.L.R.2d 972, 976 (1958))).

The supreme court's distinction between the validity of the mortgage and the validity of the underlying debt has been applied in other jurisdictions. For example, in *McHenry Savings Bank v. Pioneer National Title Insurance Co.,* 186 Ill.App.3d 238, 132 Ill. Dec. 617, 540 N.E.2d 357 (1989), a mortgage had been deemed fraudulent because the mortgagor never signed the mortgage or held title to the mortgaged property. The Illinois court held that the loss caused by the fraudulent mortgage was covered, stating that "[n]otwithstanding that the policy ... insured [the situation] where the title was vested otherwise than as stated in schedule A ..., the policy also covered loss or damage resulting from the invalidity or unenforceability of the *mortgage lien.*" *Id.,* 132 Ill. Dec. at 620, 540 N.E.2d at 360 (emphasis added) (citing *Bank of Miami Beach,* 239 So.2d at 97); *see also Citicorp Sav. v. Stewart Title Guar. Co.,* 840 F.2d 526, 529–30 (7th Cir.1988) (applying Illinois law) (holding that the mortgagor's legal incompetence at the time of the execution of the *mortgage* was a covered risk under the title policy's "invalidity or unenforceability" provision); *Ferrell,* 213 So.2d at 520 (holding that a forged mortgage was a "defect" covered by a mortgage title policy). In *Gerrold v. Penn Title Insur-*

**13.** The district court stated several times in its memorandum of decision and order that the title policies insured only that the title to the property was properly vested in AmeriFirst, the mortgagor. *See Lawyers Title,* 818 F.Supp. at 1546 ("[T]he language of the insurance policy indicates that Lawyers Title only guaranteed the validity of AmeriFirst's title to the property."); *id.* ("Essentially, the title insurance policy addressed JDC's risk that AmeriFirst's title to the property might be defective."); *id.* at 1547–48 ("[T]he

policy insured only that AmeriFirst held valid, unencumbered title to the mortgaged property."). It is clear from the Supreme Court of Florida's statement in *Bank of Miami Beach,* however, that the policies indemnified against more than the risk that AmeriFirst did not hold good title to the property; decisions of other jurisdictions are in accord. As we discuss below, however, the policies did not insure against the defenses asserted by BST.

*ance Co.*, 271 N.J.Super. 50, 637 A.2d 1293 (App.Div.1994), on the other hand, the court held that the mortgagee's failure to deliver the loan proceeds to the mortgagor, which resulted in a failure of consideration, was not a covered risk under an invalidity clause. *See id.*, 637 A.2d at 1295 (citing *Bank of Miami Beach*, 239 So.2d at 98).

*Bank of Miami Beach* leads us to conclude that the "invalidity or unenforceability" provision of the title policies is unambiguous. The provision has been judicially defined and neither party presented to the district court evidence that the parties intended any definition other than the one that the Supreme Court of Florida set forth in *Bank of Miami Beach. Cf. Guarantee Abstract & Title Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 216 So.2d 255, 257 (Fla.2d Dist.Ct.App.1968) (determining that the phrase "actual possession" in a title policy "is a term of art with a precise legal meaning, and must be examined in that light"). Generally stated, the provision insures against defects in the mortgage itself, but not against problems arising from or related to the underlying debt.

■ An examination of the purpose of title insurance supports this conclusion. Contracts of insurance should "receive a practical, reasonable, and fair construction consonant with the apparent object and intent of the parties" viewed in light of their purpose. 43 Am.Jur.2d *Insurance* § 276, at 350 (1982). Florida law defines title insurance as "insurance ... against loss by encumbrance, or defective titles, or invalidity, or adverse claim to title." Fla.Stat.Ann. § 624.608 (West 1984). Consistent with this purpose, an insured should reasonably expect that a title company has examined the public records pertaining to the insured interest before it issues a policy. 9 John A. Appleman & Jean Appleman, *Insurance Law & Practice* § 5201, at 8–9 (1981). The *Bank of Miami Beach* distinction between the mortgage and the underlying debt, which relieves the title

insurer of the burden of investigating the origin of the debt and the relationship of the parties, is consistent with the traditional role of title insurance.

2:

■ Having concluded that the coverage provision at issue here is unambiguous, we now determine whether the facts and legal theories BST alleged in its pleadings fell within the ambit of the provisions, thus triggering Lawyers Title's duty to defend. We conclude that they did not.

It is certainly true that the joint venture, and BST as its general partner, were properly joined and had standing to assert defenses on behalf of the AmeriFirst land trust because the joint venture was the beneficiary of the trust. *See Cowen v. Knott*, 252 So.2d 400, 402 (Fla.2d Dist.Ct.App.1971). The defenses asserted by BST on behalf of the joint venture, however, all explicitly related to the effect of the parties' relationship on the collectability of the debt underlying the mortgage rather than the validity of the mortgage itself. Stated generally, BST's Motion to Quash and its first, third, fourth, fifth, and seventeenth affirmative defenses revolved around two key facts: (1) JDC and BST were joint venture partners; and (2) JDC sought to foreclose on mortgages and security interests that were based on partnership debts.[14]

A mortgagee's title policy protects that mortgagee against certain risks related to the validity of the mortgage itself, such as fraud, incompetency of the mortgagor, or failure to properly execute the mortgage. Here, however, JDC requests that this court find that a title company had a duty to defend an action in which JDC, in the end, asserted eleven claims, only two of which had to do with the covered mortgages, and in which BST asserted seventeen affirmative defenses, only five of which, even by JDC's

---

14. For example, BST's memorandum of law in support of its Motion to Quash, the filing that caused JDC to notify Lawyers Title and assert that Lawyers Title had a duty to defend, stated:

The invalidity of the mortgage is based upon two fundamental tenets of *partnership law.* First, as a general partner, [JDC] is jointly

liable for debt of the partnership.... Second, [JDC] owes its partners the highest duty of good faith and loyalty.... [JDC] cannot create a default on an alleged joint venture debt to itself and then attempt to use that default to misappropriate joint venture property to itself.

(emphasis added) (citations omitted).

contentions, had any relation to the mortgages at all. In issuing the title policies, Lawyers Title did not insure the validity or collectability of the debt underlying the mortgages; nor did Lawyers Title make itself responsible for discovering the existence of, much less predicting the ramifications of the collapse of, the partnership relationship between the mortgagee and the beneficiary of the trust mortgagor. A finding that Lawyers Title had a duty to wade into this partnership morass would be inconsistent with Florida law as established in *Bank of Miami Beach* and would force insurers to "underwrite risks not bargained for by either party." *Pioneer Nat'l Title Ins. Co. v. Fourth Commerce Properties Corp.*, 487 So.2d 1051, 1054 (Fla.1986); *cf. Barczewski v. Commonwealth Land Title Ins. Co.*, 210 Cal.App.3d 406, 258 Cal.Rptr. 386, 388 (1989) (noting that accepting the plaintiff's argument for coverage "would dramatically change the function and purpose of title insurance with enormous social and financial repercussions").

■ If the alleged facts and legal theories do not fall within a policy's coverage, no duty to defend arises. *See, e.g., Lenox Liquors,*

358 So.2d at 536 (holding that allegations of intentional acts causing injury resulted in the complaint falling outside the coverage of an insurance policy insuring only against accidental injury); *Chicago Title Ins. Co. v. CV Reit, Inc.*, 588 So.2d 1075, 1075–76 (Fla. 4th Dist.Ct.App.1991) (holding that the insurer had no duty to defend the insured because "the allegations of the initial complaint did not allege facts which would bring the case within the coverage of the title insurance policy"). We need not address whether, therefore, the policy exception on which the district court also relied applies.

Because we conclude that Lawyers Title had no duty to represent JDC in the state Foreclosure Action, the district court's judgment is AFFIRMED.

IT IS SO ORDERED.