[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

----------------------------------------

No. 05-13404
Non-Argument Calendar

----------------------------------------

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 14, 2006
THOMAS K. KAHN
CLERK

D.C. Docket  No. 03-60537-CV-MGC

WHOLESALE TELECOM CORPORATION,

Plaintiff-Counter-
Defendant-Appellant,

versus

ITC DELTACOM COMMUNICATIONS, INC.,

Defendant-Counter-
Claimant-Appellee.

----------------------------------------------------------------
Appeal from the United States District Court
for the Southern District of Florida
----------------------------------------------------------------

**(April 14, 2006)**

Before EDMONDSON, Chief Judge, TJOFLAT and CARNES, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Wholesale Telecom Corp. ("WTC") appeals a final judgment denying its cross-motion for summary judgment and granting the cross-motion for summary judgment of Defendant-Appellee ITC DeltaCom Communications, Inc. ("ITC"). No reversible error has been shown; we affirm.

ITC is a non-dominant provider of telecommunications services, including local and long-distance voice transmission; WTC is a non-dominant wholesale provider of international long-distance telecommunications services. Both ITC and WTC purchase voice transmission services and resell these services.

In January 2003, the parties entered into a contract pursuant to which ITC agreed to transmit WTC's international long-distance calls at "Horizon Level V" retail rates.[1] The contract was handled on ITC's end by personnel in the retail field sales office. ITC's rates were premised on its retail end-user experience that 95% of its international traffic was landline termination. The cost to ITC of cellular termination was considerably greater than that of landline termination but, because such a small percentage of ITC's retail traffic was cellular, ITC offered a flat rate. The Horizon Level V rates quoted to WTC were the same whether the

---

[1] The Horizon Level V rates were referenced -- but not set out -- in ITC's standard form contract. ITC faxed WTC the rate schedule then in effect after the agreement was signed. Nothing in the rate schedule suggests a guarantee of the then applicable rates for the term of the agreement for service.

calls terminated on land-lines or on cellular phones. WTC made clear to ITC that ITC's flat rate was very important in WTC's decision to contract with ITC.

ITC installed the lines required to transmit WTC's international calls in late January 2003; WTC began routing its calls through ITC's network on 1 February 2003. Under the Horizon Level V rates, WTC incurred a charge of approximately $37,000 through 20 February 2003; ITC's cost for routing WTC's traffic for this initial period was approximately $102,000. ITC's retail sales force also added two other reseller customers who, together with WTC, nearly doubled ITC's international traffic. Under the Horizon Level V flat rates, ITC recouped only approximately 36% of its costs of providing service. The retail sales force was unaware of the cost differential to ITC depending on where an international call terminated. And, according to ITC, approval of the Horizon Level V rates to these resellers was based on a misunderstanding about the volume of international cellular traffic to be expected.

To address its error and to remedy the resultant cost disparity, ITC modified its rates, effective 21 February 2003, by imposing a surcharge on international calls terminating on cellular telephones. ITC posted these surcharges on its website. ITC also informed WTC and the other two resellers of the new surcharges and offered each of them the option to terminate their ITC contract or

3

accept a higher rate. The other two resellers reached an agreement with ITC. WTC refused to accept a rate change and continued to send traffic over ITC's lines after the effective date of the surcharge. ITC thereafter billed WTC at the surcharged rate and required WTC to provide security equal to two months estimated usage. WTC maintained that its agreement with ITC entitled it to the Horizon Level V rate without surcharge; it refused the security demand and continued to tender payment at the initial Horizon Level V rates.

WTC sought injunctive relief, specific performance and damages based on its assertion that ITC (i) breached their contractual agreement; (ii) engaged in unjust and unreasonable practices and discrimination, in violation of 47 U.S.C. §§ 201(b) and 202(a); and (iii) committed fraud. ITC filed a counterclaim for breach of contract and action on an account. The district court denied WTC preliminary injunctive relief; ITC terminated services to WTC on 8 May 2003.

The service agreement between ITC and WTC provides:

> Customer hereby agrees to all the terms and conditions of this Agreement for Service ("Agreement") and the terms and conditions of the state and federal tariffs of ITC^DeltaCom Communications, Inc. ("ITC^DeltaCom"), as the same exist or may be modified in the future by ITC^DeltaCom, including limitations on ITC^DeltaCom liabilities, filed with the respective regulatory bodies and/or as the same may appear on ITC^DeltaCom's website (www.itcdeltacom.com).

The district court determined that the unambiguous language of the agreement entitled ITC to raise its rates through the tariffs posted on its website. We agree.

The meaning of the word "tariff" as used in the agreement is critical to the parties's conflicting construction of their respective contractual rights. Before ITC and WTC entered into the service agreement in 2003, the regulations applicable to the tariffing of international telecommunications experienced a significant policy shift. In 2001, the Federal Communications Commission determined to detariff international long distance services provided by non-dominant carriers (such as ITC) and, after a nine-month transition period, all such tariffs, with limited exceptions, were cancelled. <u>Report and Order: In the Matter of 2000 Biennial Regulatory Review Policy and Rules Concerning the International, Interexchange Marketplace</u>, 16 F.C.C.R. 10,647; 16 FCC Rcd. 10,647 (March 20, 2001). After January 2002, non-dominant carriers in the provision of international and interstate domestic interexchange services were to cease filing tariffs for such services. 47 C.F.R. § 61.19. Instead, the FCC required non-dominant carriers to make publically available information about their current rates; and if the carrier maintains a website, the rate information must be posted on the website. 47 C.F.R. § 42.10. So, at the time ITC and WTC entered their

agreement, there could be no federal regulatory tariff filing of the Horizon Level V rates.

WTC seems to argue that, because of detariffing, ITC could post no tariffs on its website because no tariffs could be filed with the regulatory body. Noting that the service agreement contains a merger clause, WTC maintains that the unilateral posting of the rate surcharge by ITC could effect no change in the terms of the service agreement.

Both parties assert that the contract is unambiguous. That the parties differ on the meaning of a contract term does not render the contract ambiguous and thereby defeat summary judgment. See Lawyers Title Ins. Corp. v. JDC (America) Corp., 52 F.3d 1575, 1580 (11th Cir. 1995); Wayne J. Griffin Electric, Inc. v. Dunn Constr., Co., 622 So.2d 314, 317 (Ala. 1993).[2] Instead, when, as here, we determine that the contract is susceptible to only one reasonable interpretation, summary judgment appropriately may be awarded. Id.

As the district court explained, the service agreement fails to limit the term "tariff" to tariffs filed with a regulatory body. To be sure, the word "tariff" does include filings with an appropriate government agency; but it is not so limited. As the district court noted correctly, "the word 'tariff' has a meaning independent of a

[2]The Agreement for Service provides that Alabama law applies.

6

rate schedule filed with a regulatory body." See Blacks Law Dictionary, 8[th] Ed. (2004) (listing among the definitions of tariff "[a] schedule listing the rates charged for services provided by a public utility, the U.S. Postal Service, or a business (esp. one that must by law file its rates with a public agency); The American Heritage Dictionary of the English Language, 4th Ed. (2000) (defining tariff as "[a] schedule of prices or fees.").

To limit the word "tariffs" to matters filed with a regulatory body would nullify the "or" clause in the service agreement. We conclude, as did the district court, that the plain language of the service agreement contemplates "tariffs" (i) filed with a regulatory body or (ii) posted on ITC's website or (iii) both. Because the service agreement entitled unambiguously ITC to modify the terms and conditions of its state and federal tariffs by modifying the same on its website, summary judgment was due to be denied to WTC on its breach of contract claim.

We have reviewed and find without merit WTC's other claims of unjust and unreasonable discrimination and fraud. The surcharge imposed on the Horizon Level V rates applied to all customers under that rate. ITC offered WTC and the other two customers the same options; WTC failed to proffer evidence that ITC treated similarly-situated customers differently. And the record shows no material dispute about the reasonableness of the rate surcharge or the demand for additional

credit or both in the light of ITC's cost structure and its contractual entitlement to adjust charges.  About the fraud claim, the service agreement contained a merger clause that disclaimed  representations made before the contract was executed. And as we have explained, the service agreement guaranteed no rate; instead, through its incorporation of tariffs published on ITC's website, the service agreement allowed the rate surcharge which WTC seeks to label as fraudulent.

After review of all the arguments, we discern no reversible error in the order denying partial summary judgment to ITC and granting summary judgment to WTC on its breach of contract counterclaim.

**AFFIRMED.**