[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 23-10137

————————————————

ANNETTE DAVIS,

Plaintiff-Appellant,

*versus*

GREAT NORTHERN INSURANCE COMPANY,
FEDERAL INSURANCE COMPANY,

Defendants-Counter Claimants-Counter Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:21-cv-61958-AHS

————————————————

Before JORDAN, BRASHER, and ABUDU, Circuit Judges.

PER CURIAM:

Annette Davis appeals from the district court's grant of summary judgment to Great Northern Insurance Company and Federal Insurance Company, which are indirect, wholly owned insurance subsidiaries of Chubb Limited. Ms. Davis sought to enforce a so-called *Coblentz* settlement agreement against Chubb, alleging that its subsidiary insurers had breached their duty to defend in an underlying action she had brought. *See Coblentz v. Am. Sur. Co. of N.Y.*, 416 F.2d 1059 (5th Cir. 1969). The district court ruled that the *Coblentz* agreement could not be enforced, reasoning in part that the Chubb insurers had offered to defend under a reservation of rights and thus not breached their duty. We agree, and therefore affirm the district court's ruling that the *Coblentz* agreement cannot be enforced against Chubb.[1]

## I. BACKGROUND

### A.    Facts[2]

### 1.    The Underlying Litigation

This case arises out of Ms. Davis' negligence claim against Akam-On Site, Inc., the management company of The Tides at Bridgeside Square Condominium, where she resided. In April of 2018, Ms. Davis sued Akam in state court for negligent property

---

[1] As to issues not specifically discussed, we summarily affirm.

[2] For ease of reference, we collectively refer to Chubb and its subsidiaries as Chubb.

management regarding its annual maintenance on a water-cooling tower at The Tides. *See* D.E. 202-11 at 3; D.E. 216-12 at 2. Ms. Davis, who is immunocompromised, alleged that Akam's negligent work on a drainage pipe caused mold inside her apartment walls and forced her to undergo immunoglobulin treatment sessions every three weeks for the rest of her life. *See* D.E. 202-1 at 5–6.

The Tides designated Akam as a "named insured" in its two liability policies under its property management contract. *See* D.E. 202-4 at 10. Akam's first policy was issued by AmTrust International Underwriters and insured The Tides under a primary commercial general liability policy. *See* D.E. 23-1. The AmTrust policy contained an "Organic Pathogen Exclusion," which excluded bodily injury "which would not have occurred but for . . . exposure to . . . any '[o]rganic pathogen,'" including "any type of mold[.]" *Id.* at 76–77. Chubb issued the second policy under the Great Northern Insurance Company, which provided excess coverage to the primary AmTrust policy. *See* D.E. 202-35.

In a letter to The Tides on May 31, 2018, AmTrust stated that it "ha[d] agreed to provide [The Tides] a defense against the claims asserted in the [underlying action] subject to certain rights reserved in [its] letter" and had "already arranged [to provide] such [a] defense" if necessary. *See* D.E. 202-7 at 2. The letter also referenced the organic pathogen exclusion in the AmTrust policy, noting that the exclusion would apply to losses related to "bodily injury and/or property damage" if such losses were "the result of mold." *Id.* at 5.

AmTrust retained an attorney to defend Akam and provided a "full, complete defense" against all of Ms. Davis' allegations. *See* D.E. 202; D.E. 255. AmTrust did not ask Chubb to participate in this initial defense of Akam. Nor did AmTrust request payment from Chubb to defray the costs associated with such a defense. *See* D.E. 202-5 at 114.

**2.    Chubb's Reservation of Rights Letters**

In July of 2018, Akam notified Chubb of the lawsuit. *See* D.E. 202-9. Chubb responded by issuing its first reservation of rights letter on October 9, 2018. *See* D.E. 202-11. Chubb acknowledged that AmTrust was fully defending Akam and explained that its letter was "not a denial of coverage." *Id.* at 22. The letter also informed Akam that Chubb was "monitoring th[e] matter under a complete reservation of rights" and that "Akam . . . acknowledge[d] and accept[ed] all of these rights pursuant to the reservation . . . ." *Id.*

In January of 2019, during the initial phase of the case, Akam's counsel (appointed by AmTrust) produced a pre-mediation report which estimated that Ms. Davis had only a 20–30% chance of obtaining a favorable verdict. *See* D.E. 202-14 at 35. Based on that estimate, the report valued the potential settlement of the underlying action at $150,000 to $200,000. *Id.*

More than a year later, in March of 2020, Akam's counsel produced a second report which reiterated the previous estimate for a favorable verdict and revised the settlement value slightly to a new range of $150,000 to $250,000. *See* D.E. 202-36 at 58. This

report explained that Ms. Davis would have "a difficult time proving causation of damages if liability [was] proven" and "recommended attempting settlement in the range of the defense costs." *Id.*

During the initial phase of the litigation, Ms. Davis offered to settle the case with Akam for $3.75 million and later for $2.975 million. D.E. 202-15 at 58; D.E. 202-36 at 3. To that end, the first report to AmTrust stated that "[t]he biggest problem[ ] to resolution [was] [p]laintiff's attorney's unrealistic evaluation of the case." *See* D.E. 202-15 at 58.

Ms. Davis retained experts who estimated the present value of her economic damages, including past and future medical expenses and lost earnings. Those estimates ranged from $10,485,430 at the low end to $21,989,181 at the high end. *See* D.E. 216-23 at 193; D.E. 216-24 at 107.

### 3.    The *Coblentz* Agreement

In September of 2020, Ms. Davis and Akam participated in another unsuccessful mediation. *See* D.E. 202-5 at 98:3–15. That month, Akam retained separate counsel in addition to the joint counsel that AmTrust had originally appointed. *See* D.E. 202-30 at 6. At one point, the mediator introduced the possibility of a *Coblentz* agreement for the first time. *See* D.E. 221 at 21. Akam declined to settle under a *Coblentz* agreement and, as a result, Ms. Davis filed a second lawsuit in state court against Akam, The Tides, and Chubb in November of 2020. *See* D.E. 1-2 at 2.

23-10137               Opinion of the Court                    6

With trial set to start in May of 2021, Chubb sent a letter on December 10, 2020, advising Akam that it had "decided to exercise its right to participate in the defense" and that it had hired additional counsel to jointly represent Akam in the underlying litigation. *See* D.E. 202-18. In its own words, Chubb wanted to "minimize [its] exposure to [the] insured" by "supplement[ing] the [existing] trial team with the best trial lawyers [it] could find." D.E. 202-10 at 42. Six days later, Akam's separate counsel responded to the letter, asking Chubb to "promptly and clearly articulate the terms under which Chubb [was] now offering to defend [Akam], so that an informed decision to accept or reject the defense [could] be made." D.E. 202-19. On December 22, 2020, Chubb responded to Akam that it had "been handling this matter for Akam under a complete reservation of rights, which ha[d] been accepted," and that Chubb had retained a law firm "to act as co-trial counsel for Akam." D.E. 202-20.

On February 5, 2021, Akam's separate counsel rejected Chubb's tendered defense, stating that Akam had now "had the opportunity to consider Chubb's offer of a qualified defense, nearly two years after litigation incepted, and respectfully reject[ed]" the offer. *See* D.E. 202-21. One week later, Chubb reiterated "its request to associate in as defense counsel [and] . . . to assist with Akam's defense in the [l]awsuit." *See* D.E. 202-22. Chubb also pointed out that "Akam [had] accepted [its] reservation [of rights] and to date ha[d] never voiced any objection." *See id.*

Shortly thereafter, Ms. Davis entered a *Coblentz* agreement with Akam and The Tides. *See* D.E. 202-33. This agreement secured Ms. Davis a payment of $250,000, with Akam contributing $100,000 and AmTrust contributing the remainder on Akam's behalf. *See id.* at 1. The agreement also assigned to Ms. Davis all claims held by Akam against Chubb stemming from Chubb's alleged refusal to defend and denial of coverage. *See id.* at 7. The agreement included a consent judgment in favor of Ms. Davis and against Akam for $14.5 million and specified that the "right to seek satisfaction of [that] judgment [was] solely against [Chubb]." *Id.* at 8.

### B.    Procedural History

As noted, in November of 2020, Ms. Davis filed a lawsuit against Akam, The Tides, and Chubb in state court. *See* D.E. 1-2 at 2. One month later, Chubb removed Ms. Davis' action to federal court. *See id.* Shortly thereafter, Ms. Davis moved to drop The Tides and Akam as parties for "no longer hav[ing] an interest in the outcome of this litigation," leaving Chubb as the sole defendant. *See* D.E. 1-4 at 2.

Ms. Davis eventually sought to enforce the *Coblentz* agreement against Chubb, and both parties moved for summary judgment. *See* D.E. 198, 203. In support of its motion, Chubb argued that (1) Akam breached the cooperation provision of its policy by entering into a *Coblentz* agreement; (2) the *Coblentz* agreement was neither reasonable nor negotiated in good faith;

and (3) the *Coblentz* agreement did not allocate between covered and uncovered damages.  *See* D.E. 203.

The district court granted summary judgment for Chubb. As relevant here, the court found that, as a matter of law, Ms. Davis failed to meet each of the requirements needed to enforce a *Coblentz* agreement and that "[n]o reasonable jury could find [that] Chubb refused to defend Akam."  *Davis v. Great N. Ins. Co.*, 650 F. Supp. 3d 1332, 1339 (S.D. Fla. 2023).  The district court also explained that the $14.5 million consent judgment under the *Coblentz* agreement was 58 times the pre-trial report range of $150,000 to $250,000, and more than three times higher than any demand ever made by Ms. Davis during the mediation proceedings.  *See id.* at 1341.  Accordingly, the district court entered judgment in favor of Chubb, finding the consent judgment unenforceable under Florida law.  Ms. Davis timely appealed.

## II. STANDARD OF REVIEW

We review *de novo* the district court's grant of summary judgment, viewing all facts in the light most favorable to the non-moving party. *See Morales v. Zenith Ins. Co.*, 714 F.3d 1220, 1226 (11th Cir. 2013).  The district court's interpretation of insurance policy language is also subject to plenary review.  *See Cathbake Investment Co. v. Fisk Electric Co.*, 700 F.2d 654, 656 (11th Cir. 1983).

Summary judgment is appropriate only when there exists no genuine factual dispute and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  "Once the movant adequately supports it motion, the burden shifts to the nonmoving party to

show that specific facts exist that raise a genuine issue for trial." *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010).

### III. DISCUSSION

Ms. Davis raises multiple arguments on appeal in support of her contention that the district court improperly granted summary judgment to Chubb. As relevant here, Ms. Davis contends that, contrary to the district court's order, genuine issues of material fact exist with regard to (1) the extent of Chubb's coverage for Akam under its existing policies; (2) whether Chubb wrongfully denied coverage to Akam and The Tides; and (3) whether the *Coblentz* agreement between Ms. Davis, The Tides, and Akam was negotiated in good faith and settled at a reasonable amount. *See* Appellant's Br. at 18–38.

To determine whether a *Coblentz* agreement is enforceable under Florida law, a court must typically analyze (1) whether there was coverage under the relevant insurance policy; (2) whether the insurer wrongfully refused to defend; and (3) whether the settlement amount was unreasonable and negotiated in bad faith. *See Chomat v. N. Ins. Co. of N.Y.*, 919 So. 2d 535, 537 (Fla. 3d DCA 2006). Because we conclude that Chubb did not wrongfully refuse to defend Akam and The Tides, we express no opinion on the issues of coverage and reasonableness. For this reason, our analysis

23-10137                Opinion of the Court                10

focuses on the extent to which an insurer is bound by its duty to defend and when that duty is breached under Florida law.[3]

### A.    An Insurer's Duty to Defend

Under Florida law, "an insurer's duty to defend is separate and distinct from its duty to indemnify, and is more extensive." *First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co.*, 695 So. 2d 475, 476 (Fla. 3d DCA 1997). Thus, "an insurer is obligated to defend a claim even if it is uncertain whether coverage exists under the policy." *Id.* Moreover, in Florida, an insurance provider's duty to defend an insured party "depends *solely* on the facts and legal theories alleged

---

[3] "The reasonableness of the settlement . . . is generally a question of fact, taking into account the likelihood of a judgment against the insured as well as the possible amount of liability," and thus a matter best left for the jury. *See* 1 New Appleman Law of Liability Insurance § 1.05[2][i] (2d ed. & September 2019 update). Although we do not decide the matter of reasonableness, we note that the district court did not consider the evidence in the record that Ms. Davis retained experts who estimated the present value of her economic damages, including past and future medical expenses and lost earnings, as ranging from $10,485,430 at the low end to $21,989,181 at the high end. *See* D.E. 216-23 at 193; D.E. 216-24 at 107. *See also* D.E. 202-15 at 53. The district court also did not consider that, at the time of the *Coblentz* agreement, the trial court in the original state court action had denied summary judgment to Akam and The Tides while also granting partial summary judgment to Ms. Davis on the issue of Akam's and The Tides' unlicensed mold remediation in her unit, in violation of Fla. Stat. § 468.84. *See* D.E. 216-12. Given these developments, the earlier valuation of Ms. Davis' claim in the two reports provided to AmTrust did not tell the whole story. At the summary judgment stage, the district court was required to view the evidence in the light most favorable to Ms. Davis and we have some doubts that it did so on the issue of reasonableness.

in the pleadings and claims against the insured." *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1275 (11th Cir. 2008) (emphasis in original). Accordingly, an insurer's duty to defend "arises when the relevant pleadings allege facts that 'fairly and potentially bring the suit within policy coverage.'" *Lawyers Title Ins. Corp. v. JDC*, 52 F.3d 1575, 1580 (11th Cir. 1995) (citation omitted).

An insurer's wrongful refusal to defend forfeits its corresponding right to control the defense. *See Bellsouth Telecomm., Inc. v. Church & Tower of Fla., Inc.*, 930 So. 2d 668, 671–72 (Fla. 3d DCA 2006). It is well-established under Florida law that "an insurer's unjustified refusal to defend a suit against the insured relieves the insured of his contract[ual] obligation to leave the management of such suit to the insurer and justifies him in assuming the defense of the action on his own account." *Id.* at 672 (citation and internal quotation marks omitted). Under such circumstances, "if it is later determined that the insured was entitled to coverage, the insured will be entitled to full reimbursement of the insured's litigation costs." *Id.* at 671.

## B.    Defending an Insured Under a Reservation of Rights

Because under Florida law an insurer may not lawfully refuse to defend even when it suspects that coverage might not exist, "an insurer may provide a defense under a reservation of rights." *Nat'l Union Fire Ins. Co.*, 695 So. 2d at 476–77. A reservation of rights allows an insurer to "provide a defense while still preserving the option to later litigate and ultimately deny coverage." 14A Couch on Insurance § 202:39 (3d ed. & Nov. 2023

23-10137              Opinion of the Court                    12

update).  In essence, a reservation of rights letter is a mechanism that allows the insurer to avoid "breaching its duty to defend by allowing the insurer to challenge its liability on the underlying claim while still fulfilling its obligations under the policy."  *Id.* Defending a claim under a reservation of rights "enables an insurer to preserve its right to contest the duty to indemnify if the defense is unsuccessful."  *Id.*

Florida courts have made clear that "[a]n insurer does not breach its duty to defend an insured when it provides a defense under a reservation of rights."  *Nat'l Union Fire Ins. Co.*, 695 So. 2d at 477.  *See also Giffen Roofing Co. v. DHS Devs., Inc.*, 442 So. 2d 396, 396–97 (Fla. 5th DCA 1983); *Liability Colony Ins. Co. v. G & E Tires & Serv., Inc.*, 777 So. 2d 1034, 1037–38 (Fla. 1st DCA 2009); *Eckerd Youth Alternatives, Inc. v. Devereux Found., Inc.*, 366 So. 3d 1154, 1158 (Fla. 2d DCA 2023).  An insurer is entitled to tender such a defense because "the law distinguishes between the insurer's duties to defend and to pay."  *Taylor v. Safeco Ins. Co.*, 361 So. 2d 743, 745 (Fla. 1st DCA 1978).  Because a defense subject to a reservation of rights does not constitute a wrongful refusal to defend, an insurer retains its right to control the defense.  *See Continental Cas. Co. v. City of Jacksonville*, 283 F. App'x 686, 690 (11th Cir. 2008) (unpublished). At the same time, an insured is "not obliged to surrender control of his personal defense to an insurer which disclaimed responsibility for any judgment within policy limits that might result from the litigation."  *Id.*  Therefore, "if the insurer offers to defend under a reservation of rights, the insured has the right to reject the defense and hire its own attorneys and control the

defense." *BellSouth*, 930 So. 2d at 671. *See also Mid-Continent Cas. Co. v. Am. Pride Bldg. Co., LLC*, 601 F.2d 1143, 1149 (11th Cir. 2010) ("While an insurer must defend its insured, and may tender its defense subject to a reservation of rights, Florida law does not require an insured to accept such a defense.").

Our unpublished decision in *City of Jacksonville* illustrates these principles well. In that case, the insurer agreed to defend the City of Jacksonville in a toxic tort lawsuit. The insurer proceeded with its defense—paying reasonable and necessary legal expenses—while simultaneously issuing a complete reservation of rights. *See* 283 F. App'x at 687. The City accepted the defense but argued that it had the right to control the defense because the insurer had tendered a defense subject to a reservation of rights. *See id*. The insurer obtained a declaratory judgment which stated in relevant part that it had fulfilled its obligations and that the City's failure to cooperate "was a material failure that substantially prejudiced [the insurer]." *Id*. at 688. On appeal, the City characterized the insurer's defense under a reservation of rights as a refusal to defend, "allowing [it] to retain full control of the defense and entitling it to settle without [the insurer's] consent." *Id*.

We affirmed the district court's grant of summary judgment for the insurer and reiterated Florida's long-standing rule that an insurer's offer to defend subject to a reservation of rights does not amount to a refusal to defend. *See id*. at 689. We noted that the City took ten months to notify the insurer of the underlying action. *See id*. at 690. Because the insurer promptly offered to defend

subject to a reservation of rights, we affirmed the district court's finding that the insurer had fulfilled its duty to defend. *See id.*

We reached a similar conclusion two years later in *Gallina v. Com. & Indus. Ins.*, 375 F. App'x 935, 936 (11th Cir. 2010) (unpublished). In that case, a construction worker initiated a tort claim against his employer for an injury suffered on a work site. The employer's insurance company assumed a full defense of the claim, but the employer's personal counsel requested the insurer "confirm or deny coverage." *Gallina v. Com. & Indus. Ins.*, 2008 WL 4491543, at *3 (M.D. Fla. Sept. 30, 2008). The insured later "reject[ed] [the] defense due to [the insurer's] reservation of rights" and informed the insurer that the insured "was assuming its own defense of the . . . action." *Id.* at *4. The next day, the injured worker and the insured entered into a *Coblentz* agreement against the insurer. *See id.*

The district court in *Gallina* distinguished *BellSouth*, 930 So. 2d at 670, explaining that the insurer in that case had refused to defend its insured because of late notice. *See* 2008 WL 4491543, at *7. The insured there was forced to assume its own defense against the claim, only for the insurer to retract its position a year later and seek to assume the insured's defense once the insured initiated a declaratory action against the insured. *See id.* Accordingly, the court found that the insured would suffer material harm if forced to relinquish control of its defense to the insurer. *See id.* By contrast, in *Gallina* the insurer had "not waive[d] its right to defend." *See id.* at *8. On the contrary, the insurer had provided a

defense "[f]rom the inception of [the] action." *See id.* The district court granted the insurer's motion for summary judgment, and we affirmed. We concluded that the insured had "breached its contract with [the insurer] by settling its case with the injured party, without [the insurer's] consent, and [by] rejecting [the insurer's] unconditional defense." *Gallina*, 375 F. App'x at 937.[4]

## C.    An Excess Insurer's Duty to Defend

With respect to an excess insurer's duty to defend, the majority rule is that an excess insurer "is not obligated to defend its insured until all primary insurance is exhausted or the primary insurer has tendered its policy limits. An excess carrier may nevertheless voluntarily participate in the insured's defense but has no obligation to do so." 14A Couch on Insurance § 200:39 (3d ed. & Nov. 2023 update). Based on the one case we have been able to locate, it appears to us that Florida will follow the majority rule. *See U.S. Fire Ins. Co. v. Mikes*, 576 F. Supp. 2d 1303, 1325 (M.D. Fla. 2007) ("Once an insurer assumes the defense of the insured pursuant to its duty to defend, other insurers, including an excess insurer, that provide coverage and have a duty to defend are ordinarily no longer obligated to provide a defense to the insured."), *aff'd*, 279 F. App'x 879, 881 (11th Cir. 2008) (the duty to defend "does not extend to an excess insurer when a primary insurer has a duty to defend"). *Accord* 31A Fla. Jur. 2d Insurance § 3153 (2d ed. & March 2024 update) ("An excess insurer has no duty

---

[4] *City of Jacksonville* and *Gallina* are unpublished decisions, and therefore not binding, but we find them persuasive.

to defend the insured as long as the primary insurer has such a duty."). The rationale for this rule "is that the insurer undertaking the representation does so for all the claims and damages, whether or not the claims are covered by its policy." *U.S. Fire Ins. Co.*, 576 F. Supp. 2d at 1325.

## D.     Application

Chubb was an excess insurer for Akam. But we will assume that it had some duty to defend Akam—despite AmTrust's undertaking of the defense—on the theory that at some point Chubb might (or would) have been on the hook due to the organic pathogen exclusion in the AmTrust policy. *See* D.E. 23-1 at 76. Even so, the undisputed facts in this case establish that Chubb never refused to defend Akam or The Tides at any time during the underlying litigation.

Chubb issued its first reservation of rights letter to Akam on October 9, 2018, about three months after Akam provided notice of Ms. Davis' lawsuit. *See* D.E. 202-11. While acknowledging that AmTrust was providing Akam a defense and suggesting that Chubb's primary policy was in excess to that of AmTrust, the letter explicitly stated that it was "not a denial of coverage." *See id.* at 22. The letter reiterated that AmTrust was defending Akam in the underlying action under a general liability policy issued to The Tides, under which Akam was a named insured. *See id.* at 2.

On February 8, 2019, Chubb issued a second reservation of rights letter, reiterating that AmTrust was fully defending Akam under its primary policy and that because the Chubb policies were

excess to the primary AmTrust policy, Chubb would continue to monitor the underlying litigation under a reservation of rights. *See id.* at 2, 4, 20. Once again, Chubb concluded by stating that the letter was "not a denial of coverage." *Id.* at 26.

Between July of 2018 and December of 2020, Chubb actively monitored the state court litigation initiated by Ms. Davis— analyzing the liability and damages, evaluating the potential exposure to Akam, and attending mediation proceedings. *See* D.E. 202-10 at 14:7-15:1. At no point did Akam ever reject, dispute, or otherwise object to anything contained in either of the reservation of rights letters sent by Chubb in October of 2018 and February of 2019.

In addition to monitoring the underlying action, Chubb twice offered to associate additional trial counsel to defend Akam between December of 2020 and February of 2021. The first tender of a defense stated that Chubb was "exercis[ing] its right to participate in the defense" and had already "retained . . . additional counsel [to] represent[ ] Akam in the [l]awsuit." *See* D.E. 202-18. The second tender of a defense acknowledged Akam's "attempt to reject . . . Chubb's retention of additional lawyers" and reiterated its offer to "associate in defense counsel and to participate in the defense of Akam" subject to a modified reservation of rights. *See* D.E. 202-22.

With trial imminent, Akam rejected Chubb's second offer on April 15, 2021, stating, in part, that Chubb had "wrongfully refused to defend or acknowledge its indemnity obligation for two

years after litigation incepted" and forced Akam to take "steps necessary to protect its interests." *See* D.E. 202-30.  The next day, Akam entered a *Coblentz* agreement with Ms. Davis and The Tides. *See* D.E. 202-30 at 345–51; D.E. 202-38 at 5–6; D.E. 202-33.

According to Ms. Davis, Akam did not breach any duty to cooperate with Chubb under its policy by entering a consent judgment because Chubb had already repudiated coverage. Specifically, Ms. Davis points to a letter from February 19, 2019, in which Chubb stated that "at least $26,000,000 of insurance" needed to be "exhausted before [its] policies [were] implicated" in the underlying litigation.  *See* D.E. 201-30.  She argues that such an "exhaustion" could never occur given the organic pathogen exclusion in the AmTrust policy and that, as a result, Chubb's letter effectively constituted "an advanced repudiation . . . of coverage." Appellant's Br. at 22–23.  Ms. Davis therefore concludes that by February of 2019 Chubb had "disavowed its contractual obligations to Akam" and relieved Akam of its "duty to cooperate and to not make voluntary payments under the policy." *See id.*

But Florida law makes clear that Chubb was "not required to abandon its contest of a duty to pay as a condition of fulfilling an assumed or admitted duty to defend." *Taylor*, 361 So. 2d at 745.  In other words, even if Chubb's February 2019 letter amounted to an advanced repudiation of coverage, Chubb at no point breached its duty to defend Akam under the policy.  Instead, Chubb chose to undertake the defense of Akam under a reservation of rights.  "In this manner, [Chubb] . . . avoid[ed] breaching its duty to defend

while maintaining its right to later challenge its liability to indemnify for some or all of the claims" in the underlying litigation. *See Eckerd*, 366 So. 3d at 1158. Indeed, that is the very reason such a mechanism exists under Florida law. *See id.* ("Because the duty to defend is so broad, [insurers] who believe they are not liable to indemnify . . . may undertake the defense of an [insured] under a reservation rights.") (citation omitted). And, as we have explained, an excess insurer like Chubb is not generally required to provide a defense to its insured if the primary insurer has already done so. *See U.S. Fire Ins. Co.*, 576 F. Supp. 2d at 1325; 14A Couch on Insurance § 200:39.

Akam was, of course, free to reject Chubb's tendered defense at any point in the underlying litigation. But "[n]one of these options . . . allow [Akam] to receive a defense funded by someone else while at the same time retaining the freedom to independently and without consent of the paying insurer [to] settle the claim to the policy limits." *Cont'l Cas. Co. v. City of Jacksonville*, 2006 WL 8453022, at *6 (M.D. Fla. Apr. 11, 2006). This, in effect, is what Akam attempted to do by retaining both separate counsel and joint counsel appointed by AmTrust, later rejecting Chubb's defense, and finally claiming Chubb had relieved it of its duty to cooperate by not funding a defense from the very start of the litigation. *See* Appellant's Br. at 22–23.

At the end of the day, even if Ms. Davis is right about the ultimate effect of the organic pathogen exclusion in the AmTrust policy, she has not established a material issue of fact on whether

Chubb breached its duty to defend. This is fatal for her claim because "where an injured party wishes to recover under a *Coblentz* agreement, the injured party must bring an action against the insurer . . . [and] prove coverage [and a] wrongful refusal to defend." *Chomat*, 919 So. 2d at 537.

Accordingly, we agree with the district court that on this record "[n]o reasonable jury could find [that] Chubb refused to defend Akam." *Davis*, 650 F. Supp. 3d at 1339. As the district court pointed out, there is "no language cited in any correspondence indicating a refusal to defend." *Id.*

### IV. CONCLUSION

We affirm the district court's grant of summary judgment in favor of Chubb.

**AFFIRMED.**